## In re SERVICE MERCHANDISE CO., INC., et al.

### H.J. Wilson Co., Inc.,

v.

### Commissioner of Revenue for the Commonwealth of Massachusetts.

No. 3:01–0200.
Bankruptcy No. 399–02649.
Adversary No. 300–0327A.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 15, 2001.

Jeffrey S. Ogilvie, Massachusetts Dept. of Revenue, Litigation Bureau, Boston, MA, David Thomas Axford, Kitch & Axford, Mashville, TN, for appellant.

Paul G. Jennings, Beth A. Dunning, Bass, Berry & Sims, Nashville, TN, John W. Butler, Jr., George N. Panagakis, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, Alesia Ranney–Marinelli, Skadden, Arps, Slate, Meagher & Flom, New York City, for appellee.

## MEMORANDUM

CAMPBELL, District Judge.

This is an appeal from the Bankruptcy Court's Order of February 9, 2001, denying the Defendant/Appellant Commonwealth of Massachusetts' Motion to Dismiss for Lack of Jurisdiction and Motion for Determination that this Adversary Proceeding Is Not a Core Proceeding and Motion for Mandatory Abstention or, in the alternative, for Permissive Abstention. For the reasons stated herein, the Bankruptcy Court's Order is REVERSED and the case is REMANDED for disposition not inconsistent with this opinion.

The fundamental question presented in this appeal is whether the Bankruptcy Court has jurisdiction over the Commonwealth of Massachusetts or if the Commonwealth is entitled to sovereign immunity from this action under the Eleventh Amendment. The question primarily turns on whether States surrendered their sovereign immunity in bankruptcy matters when they ratified the Constitution.

The standard of review is de novo for questions of law. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir.1993). The findings of fact of the Bankruptcy Court are subject to a "clearly erroneous" standard of review. Fed. R. Bankr.P. 8013.

H.J. Wilson Co., Inc. ("HJW") seeks to recover from the Commonwealth of Massachusetts ("the Commonwealth") a corporate excise tax refund for the tax years 1987—1992. HJW filed timely petitions for abatement with the Massachusetts Appellate Tax Board, which petitions are still pending. On March 27, 1999, HJW commenced voluntary proceedings under Chapter 11 of the United States Bankrupt-

cy Code. On August 7, 2000, HJW filed this adversary complaint against the Commissioner of Revenue for the Commonwealth, seeking a determination that HJW does not owe the 1987–1992 corporate excise tax deficiency assessed against it and seeking a refund from the Commonwealth. The tax refund would necessarily have to be paid out of the Commonwealth's state treasury.

The Commonwealth moved to dismiss the adversary proceeding for lack of jurisdiction, based upon the Eleventh Amendment and principles of sovereign immunity. Alternatively, the Commonwealth moved to dismiss because it was not a core proceeding and moved for mandatory or permissive abstention.

The Bankruptcy Court denied the Commonwealth's Motions, finding no sovereign immunity and concluding that each State surrendered its sovereign immunity on matters of bankruptcy upon joining the Union "upon equal footing with the other states." Bankruptcy Court Order of February 9, 2001, p. 6. Therefore, the Bankruptcy Court concluded, it could assert jurisdiction over the Commonwealth in this adversary proceeding.

This appeal was taken from that ruling, and this Court granted the Commonwealth's Motion for Stay Pending Appeal (*see* Docket No. 19) and Motion for Leave to Appeal (*see* Docket No. 28).

Pending before the Court in this appeal are HJW's Motion for Order Vacating Stay Pending Appeal (Docket No. 27) and the Commonwealth's Motion for Entry of an Order, Nunc Pro Tunc or Otherwise, Allowing its Motion for Leave to Appeal (Docket No. 31). In light of this Order and the Court's Order of June 6, 2001 (Docket No. 28), both Motions are moot.

## SOVEREIGN IMMUNITY

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State.

U.S. Const., amend. XI.

The concept of sovereign immunity arises out of the sovereign status of each State and the inherent nature of sovereignty not to be amenable to the suit of an individual without its consent. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). HJW argues that sovereign immunity is not available as a defense to this litigation because the States surrendered sovereign immunity over bankruptcy matters in the U.S. Constitution on the circumstances presented here. *See* Appellee's Brief (Docket No. 24), p. 10. HJW contends, and the Bankruptcy Judge found, that the States surrendered their sovereign immunity with regard to bankruptcy matters when they agreed to Article I, Section 8, in which Congress is given the power to establish uniform bankruptcy laws.

The Court is not persuaded by this argument, particularly in light of the Supreme Court's explanation in *Seminole Tribe*:

> [C]ontrary to the implication of [the Dissent], it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded relief against a State under any of those statutory schemes; ... Although the copyright and bankruptcy laws have existed practically since our Nation's inception, ... there is no estab-

lished tradition in the lower federal courts of allowing enforcement of those federal statutes against the States. *Seminole Tribe,* 116 S.Ct. at 1132, n. 16. If there were no such sovereign immunity in bankruptcy matters, this language, as it relates to bankruptcy, would be rendered meaningless.

Numerous courts have applied the sovereign immunity doctrine in the bankruptcy context. *See, e.g., Sacred Heart Hospital v. Commonwealth of Pa. (In re Sacred Heart Hospital),* 133 F.3d 237 (3d Cir. 1998); *Arecibo Community Health Care, Inc. v. Commonwealth of Puerto Rico,* 244 F.3d 241 (1st Cir.2001); *NVR Homes, Inc. v. Clerks of Circuit Courts for Anne Arundel County, Md. (In re NVR, LP),* 189 F.3d 442 (4th Cir.1999); *Seay v. Tennessee Student Assistance Corp. (In re Seay),* 244 B.R. 112 (Bankr.E.D.Tenn.2000); *Scarborough v. Michigan Collection Div. (In re Scarborough),* 229 B.R. 145 (Bankr. W.D.Mich.1999); *Pitts v. Ohio Dep't of Taxation (In re Pitts),* 241 B.R. 862 (Bankr.N.D.Ohio 1999); and *Peterson v. State of Florida (In re Peterson),* 254 B.R. 740 (Bankr.N.D.Ill.2000) (citing cases). In these cases, courts found either that the State did not waive its sovereign immunity or that Congress did not effectively abrogate that immunity. Such findings impliedly assume that such sovereign immunity exists.

In light of the above authorities, the Court finds the reasoning of *Hood v. Tennessee Student Assistance Corp.,* 262 B.R. 412 (6th Cir. BAP 2001) and *Bliemeister v. Industrial Comm'n of Az. (In re Bliemeister),* 251 B.R. 383 (Bankr.D.Ariz.2000) unpersuasive. In addition, both *Hood* and

*Bliemeister* involved claims for discharge of certain debts, not a claim to recover money from the State, as we have here. *See also Commonwealth of Va. v. Collins (In re Collins),* 173 F.3d 924, 929 (4th Cir.1999) (jurisdiction over dischargeability of debt derives not from jurisdiction over the State but rather from jurisdiction over the debtors and their estates.).

The Supreme Court has recognized only two circumstances in which an individual may sue a State: (1) Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment, and (2) a State may waive its sovereign immunity by consenting to suit. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999).

By adding Section 106 to the Bankruptcy Code in 1978 and amending it in 1994,[1] Congress attempted to abrogate the Eleventh Amendment sovereign immunity in certain bankruptcy matters. 11 U.S.C. § 106. If no such immunity existed, there would have been no need to make such legislative attempts to abrogate it.

■ In order to determine whether Congress has abrogated a State's sovereign immunity, a court must ask: (1) whether Congress has unequivocally expressed its intent to abrogate immunity, and (2) whether Congress has acted pursuant to a valid exercise of power. *Seminole Tribe,* 116 S.Ct. at 1123. The *Seminole Tribe* decision in 1996 raised serious questions about the constitutionality of Section 106. In *Seminole Tribe,* the Court held that Congress had the power to abrogate a State's sovereign immunity only under the Fourteenth Amendment.

---

1. The Supreme Court held, in *Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), that Section 106(c) of the Bankruptcy Code did not effectively abrogate a State's

Eleventh Amendment immunity with respect to a money judgment, if the State had not filed a proof of claim in the case. Thus, in 1994, Congress amended the section to express its intention more clearly.

A majority of courts, finding Section 106 to have been enacted pursuant to Congress' bankruptcy powers under Article I, not pursuant to the Fourteenth Amendment, have held Section 106 to be unconstitutional. *See, e.g., Arecibo Community Health Care, Inc.; Mitchell v. Franchise Tax Bd., State of California (In re Mitchell)*, 209 F.3d 1111 (9th Cir.2000); *Dodson v. Tennessee Student Assistance Corp. (In re Dodson)*, 259 B.R. 635 (Bank.E.D.Tenn. 2001); *Grabscheid v. Michigan Employment Sec. Comm'n (In re C.J. Rogers, Inc.)*, 212 B.R. 265 (E.D.Mich.1997); *Pitts;* and *Seay*. These cases make no mention of sovereign immunity having been surrendered at the adoption of the U.S. Constitution.

■ As the Court noted in *Seminole Tribe:*

Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

*Seminole Tribe,* 116 S.Ct. at 1131–32.

■ In addition, the Court notes that this case involves an attempt by HJW to "reach into the State treasury" for the recovery of property, an action the Eleventh Amendment and sovereign immunity were specifically designed to prevent. *See, e.g., MacDonald v. Village of Northport, Michigan,* 164 F.3d 964, 970 (6th Cir.1999) (citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)) and

*Hutsell v. Sayre,* 5 F.3d 996, 999 (6th Cir.1993).

For all these reasons, the Court finds that the defense of sovereign immunity is available to the Commonwealth in this case.

■ HJW also argues that the Commonwealth has waived its sovereign immunity by filing a proof of claim. The Bankruptcy Judge did not reach this issue. In *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), the Court concluded that when a State becomes the actor and files a claim against the fund, it waives any immunity which it otherwise might have had respecting the adjudication of the claim. A State waives its immunity and consents to suit in federal court by specific declaration or act, such as filing a general appearance, or by the State becoming a plaintiff or an intervenor in the federal lawsuit. *Grabscheid,* 212 B.R. at 273.

Section 106 of the Bankruptcy Code contemplates such a waiver and provides that the filing of a proof of claim waives sovereign immunity only with respect to a claim against the governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of the governmental unit arose. 11 U.S.C. § 106(b).[2]

■ The test for finding a waiver of sovereign immunity is a stringent one. *College Savings Bank,* 119 S.Ct. at 2226. The "same transaction or occurrence" language mirrors the compulsory counterclaim language of Fed.R.Civ.P. 13, which essentially defines a compulsory counterclaim as one arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. The Sixth Cir-

**2.** As noted above, however, the majority of courts which have found this code provision to be unconstitutional.

cuit's test for determining whether a counterclaim is compulsory is to determine whether the issues of fact and law raised by the claims are largely the same and whether substantially the name evidence would support or refute both claims. *Seay,* 244 B.R. at 117 (citing *Sanders v. First Nat'l Bank & Trust Co.,* 936 F.2d 273, 277 (6th Cir.1991)).

When a State files a proof of claim in a bankruptcy proceeding, the State waives its sovereign immunity only with respect to the adjudication of that particular claim. *Grabscheid,* 212 B.R. at 274 (citing *Gardner,* 329 U.S. at 571, 67 S.Ct. 467). Otherwise, the adjudication of the State's claim would be transmitted into a suit against the State for monetary damages which would violate the principle that no judgment is sought against the State. *Id.*

Here, the Court finds that HJW's claim for refund of corporate excise tax for the years 1987 to 1992 (the subject of this adversary proceeding) is not the same transaction or occurrence or claim as the Commonwealth's claim for sales and use tax from September 1996 to March 1999 (the subject of its proof of claim). The

taxes arise under different state statutes and from different time periods. There is nothing before this Court which would show that the same evidence would support or refute both claims or that the issues of law and fact would be the same.

The Court finds that the Commonwealth's proof of claim does not waive its sovereign immunity and subject it to federal court jurisdiction for purposes of this adversary proceeding.

CONCLUSION

Having found that the Commonwealth is entitled to sovereign immunity from this adversary proceeding, the Court need not address its other arguments. The Order of the Bankruptcy Court is REVERSED and this case is remanded for disposition not inconsistent with this opinion.

IT IS SO ORDERED.

In re: Debbie Reynolds Resorts,
Inc. Debtor.

Debbie Reynolds Hotel & Casino, Inc., a
Nevada corporation; Debbie Reynolds
Management Company, Inc., a Nevada
corporation; Debbie Reynolds Re-
sorts, Inc., a Nevada corporation, Ap-
pellants,

v.

Calstar Corporation, Inc., Appellee.

Resort Funding, Inc., Appellant,

v.

Calstar Corporation, Inc., Appellee.

Nos. 99–17240, 99–17392.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 13, 2001

Filed July 6, 2001

In re: DEBBIE REYNOLDS HOTEL
& CASINO, INC. Debtor.

In re: Debbie Reynolds Management
Company, Inc. Debtor.

Bob L. Olson, Shea & Carlton, Las Vegas, Nevada, for appellant Resort Funding, Inc.

Lenard Schwartzer, Mangels, Butler, Marmaro & O'Reilly, Las Vegas, Nevada, for appellant Debbie Reynolds Hotel & Casino, Inc.; Debbie Reynolds Management Company; Debbie Reynolds Resorts, Inc.

James R. Alsup, Law Office of Federico Sayre, Newport Beach, California, for appellee Calstar Corporation.

Appeal from the United States Bankruptcy Appellate Panel for the Ninth Circuit; J.E. Ryan, Bankruptcy Judge; Christopher M. Klein, Bankruptcy Judge; Samuel L. Bufford, Bankruptcy Judge, Presiding. BAP No. 98–1862 RYKBu.

Before: SNEED, FERNANDEZ, and KLEINFELD, Circuit Judges.

SNEED, Circuit Judge:

Debtor Debbie Reynolds Hotel and Casino ("Debtor") and secured creditor Resort Funding, Inc. ("RFI") entered into a settlement agreement that provided for a $50,000 payment from RFI to Debtor's counsel pursuant to 11 U.S.C. § 506(c). The bankruptcy court approved the agreement. The Bankruptcy Appellate Panel ("BAP") reversed the bankruptcy court. Debtor and RFI jointly appeal the judgment of the BAP and ask this court to enforce the settlement agreement.

The BAP reversed the bankruptcy court on two grounds. First, the BAP held that Appellants' settlement agreement impermissibly abrogated the right of Appellee Calstar Corporation ("Calstar") to surcharge the secured collateral of RFI. Second, the BAP held that the bankruptcy court abused its discretion by permitting the payment of the surcharge directly to Debtor's counsel rather than into Debtor's estate to be distributed according to the priority schedule codified in 11 U.S.C. § 507.

We reverse the BAP and hold that the settlement agreement is valid and enforceable. Applying the recent Supreme Court decision of *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), we hold that Calstar has no standing to challenge the terms of the settlement agreement. We also hold that a surcharge secured pursuant to 11 U.S.C. § 506(c) should be distributed directly to the Debtor's counsel, whose services to the estate underlie the surcharge request.

## BACKGROUND

### A. *The Sale of the Debbie Reynolds Hotel and Casino*

In February 1998, Debtor proposed a liquidating plan of reorganization that provided for the sale of substantially all of its assets to Central Florida Investments ("CFI") for $14,000,000. RFI supported the sale, but a committee of Debtor's unsecured creditors opposed it. Rather than approve the sale as negotiated, the bankruptcy court agreed to permit interested parties to appear at a hearing to bid to purchase Debtor's property for a sum in excess of the price negotiated with CFI.

At the close of bidding, the court awarded CFI the right to purchase the property for $15,600,000. The order accepting CFI's bid also gave CFI the right to withdraw from the transaction without penalty by May 10, 1998. After completing its due

diligence, CFI exercised this right and terminated the transaction. The right to purchase the hotel then fell to Appellee Calstar for $15,500,000.

Calstar agreed to loan Debtor $150,000 to keep the hotel open while Calstar completed its due diligence prior to closing the sale. This postpetition financing was approved by the bankruptcy court on a "superpriority" basis under 11 U.S.C. § 364(c)(1). Calstar's superpriority loan did not alter the rights of secured creditors, but it gave Calstar the right to repayment ahead of all administrative and unsecured claims.[1] Calstar subsequently decided not to purchase the hotel. It withdrew from the transaction without penalty.

Finding itself without any prospective purchasers of the hotel, the bankruptcy court entered an order permitting the sale of Debtor's assets through public auction. In August 1998, the hotel and all related personal property were sold through public auction for $10,650,000.

### B. *The Settlement Agreement Between Debtor and RFI*

After the sale of the hotel, but before final approval by the bankruptcy court, Debtor's counsel sought a payment out of RFI's secured collateral under the authority of 11 U.S.C. § 506(c). Section 506(c) provides that the "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The payment of these "reasonable and necessary" expenses out of the secured property of a creditor is known as a surcharge.

RFI did not concede that Debtor's counsel had provided any measurable benefit to its secured collateral. Nevertheless, it entered into an agreement allowing Debtor's counsel to collect a $50,000 surcharge from its secured property. The surcharge agreement also provided that "RFI's secured and unsecured claims shall be irrevocably allowed and no debtor, administrative claimant or party in interest may: ... (5) seek to surcharge any of RFI's collateral pursuant to 11 U.S.C. § 506(c)." In effect, RFI attempted to buy "closure" by agreeing to a $50,000 surcharge in exchange for assurance that there would be no further challenges to collection of its secured debt.

Calstar objected to the Settlement Agreement on two grounds. First, Calstar itself sought to surcharge RFI's secured property as repayment for the benefit provided by Calstar's $150,000 loan to Debtor in May 1998. Calstar argued that the immunizing language of the Settlement Agreement improperly foreclosed Calstar's right to seek a surcharge under 11 U.S.C. § 506(c). In addition, Calstar argued that because its loan to Debtor was made pursuant to 11 U.S.C. § 364(c)(1), it should collect ahead of Debtor's counsel. Therefore, the surcharge agreement between RFI and Debtor, whereby Debtor's counsel would collect the $50,000 payment, violated Calstar's rights as a "superpriority" creditor.

The bankruptcy court approved the surcharge/settlement agreement in its entirety. The BAP, reversing the bankruptcy court, held that the lower court abused its discretion when it approved the immunizing language of the settlement agreement

---

1. 11 U.S.C. § 364 provides in pertinent part: (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title.

without first determining whether RFI benefitted from the actions of other claimants. In addition, the BAP held that the bankruptcy court erred in permitting the distribution of the surcharge directly to Debtor's attorneys rather than to the estate. This distribution "enabled [Debtor's attorneys] to get paid on a mere administrative claim ahead of Calstar, the holder of a superpriority claim under § 364(c)."

Both RFI and Debtor appealed from the BAP's reversal of the bankruptcy court's approval of the settlement agreement.

## STANDARD OF REVIEW

■ This court reviews the bankruptcy court's approval of a proposed compromise for an abuse of discretion. *Burton v. Ulrich (In re Schmitt),* 215 B.R. 417, 420 (9th Cir. BAP 1997). However, both the bankruptcy court's and the BAP's interpretation of the Bankruptcy Code is reviewed de novo. *In re Celebrity Home Entertainment, Inc.,* 210 F.3d 995, 997 (9th Cir.2000); *In re Los Angeles Int'l Airport Hotel Assocs.,* 106 F.3d 1479, 1480 (9th Cir.1997). To the extent that the bankruptcy court's approval of the settlement agreement rested on an erroneous interpretation of law, it was, per se, an abuse of discretion. *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

■ The bankruptcy court concluded that RFI could not, as a matter of law, be surcharged under 11 U.S.C. § 506(c). It approved the settlement agreement on this basis. The BAP reached the opposite conclusion. Whether section 506(c) permits Calstar to surcharge RFI is a question of law subject to de novo review.

**2.** 11 U.S.C. § 506(c) provides:
 The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of

## DISCUSSION

This case presents two distinct questions arising under Section 506(c) of the Bankruptcy Code.[2] First, we must determine whether Calstar has standing to object to the secured creditor's settlement agreement with the debtor-in-possession. The agreement foreclosed Calstar from seeking to surcharge the secured collateral of RFI. Following *Hartford Underwriters,* we hold that Calstar had no standing to seek a surcharge pursuant to § 506(c). Therefore, Calstar cannot object to the agreement which prevented it from bringing a surcharge action. We reverse the BAP decision holding otherwise.

In addition, we must determine how the $50,000 in proceeds from the § 506(c) surcharge should be distributed. We hold that under § 506(c), the party that has rendered a benefit to a secured creditor is properly reimbursed for that benefit from secured collateral. We reverse the BAP on this issue as well and hold that Debtor's counsel is entitled to the $50,000 surcharge consistent with the terms of the settlement agreement.

I. Immunizing Language of the Settlement Agreement
 A. *Under Hartford Underwriters, Calstar lacks standing to object to the settlement agreement.*

■ The only objection to enforcement of the settlement agreement—and the point on which the bankruptcy court and the BAP disagreed—was whether the immunizing provision of the agreement improperly abrogated Calstar's right to seek a surcharge from RFI pursuant to § 506(c). *Hartford Underwriters* makes clear that Calstar cannot, under any cir-

preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

cumstances, seek such a surcharge because Calstar, as a superpriority claimant, has no standing to do so. Under *Hartford Underwriters*, therefore, the immunizing language of the settlement agreement had no legal effect. Since Calstar's objection to the agreement was based on this language, that objection cannot succeed.

■ In *Hartford Underwriters*, the Supreme Court limited standing under 11 U.S.C. § 506(c) to the trustee of a bankruptcy estate or—if the proceeding is held pursuant to Chapter 11 of the Bankruptcy Code—a debtor-in-possession. *Id.,* 530 U.S. at 6 n. 3, 120 S.Ct. 1942; 11 U.S.C. § 1107(a) (in a proceeding under Chapter 11, a debtor-in-possession shall have the rights and powers of a trustee). Unsecured creditors (such as Calstar) may not seek payment for monies expended on behalf of the estate from the collateral of a secured creditor. *Hartford Underwriters*, 530 U.S. at 13, 120 S.Ct. 1942.

*Hartford Underwriters* overruled *North County Jeep and Renault, Inc. v. Gen. Electric Capital Corp. (In re Palomar Truck Corp.),* 951 F.2d 229 (9th Cir.1991). In *In re Palomar Truck Corp.,* this court held that when a trustee has "no economic incentive to seek recovery under § 506(c)," other parties who provided a benefit to secured creditors may seek a surcharge under § 506(c). *Id.,* 951 F.2d at 232. Because the present controversy arose prior to the Supreme Court's decision in *Hartford Underwriters*, both the bankruptcy court and the BAP relied on the holding in *In re Palomar Truck Corp.* Consequently, neither of the lower courts analyzed how *Hartford Underwriters'* standing requirement affects the disposition of this appeal. The holding of *Hartford Underwriters*, however, is clear and unambiguous. "The statute appears quite plain in specifying who may use § 506(c)—the trustee." *Hartford Underwriters*, 530 U.S. at 6, 120 S.Ct. 1942. Because Calstar was not the

trustee (or the debtor-in-possession) it could not seek a § 506(c) surcharge. The settlement agreement, in effect, abrogated a legal right that no longer exists. *Id.*

■ Only a party who is "directly and adversely affected pecuniarily" by an order of the bankruptcy court may appeal. To provide standing, "the order must diminish the appellant's property, increase its burdens, or detrimentally affect its rights." *In re P.R.T.C. Inc.,* 177 F.3d 774, 777 (9th Cir.1999). Calstar cannot show "direct and adverse" harm from the bankruptcy court's approval of the immunizing language in the settlement agreement. Consequently, Calstar has no standing to appeal this aspect of the bankruptcy court's order. Application of *Hartford Underwriters* to the facts of this case requires reversal of the BAP ruling.

### B. *Hartford Underwriters Applies Retroactively*

■ In *Harper v. Va. Dep't. of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), the Supreme Court simplified the doctrine of retroactivity. Under *Harper,* "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." 509 U.S. at 96, 113 S.Ct. 2510 (citing *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991)). Retroactive application of Supreme Court precedent to all cases on direct review is, therefore, the general rule. The exception to this rule is quite limited. Only when the Supreme Court "reserve[s] the question whether its holding should be applied to the parties before it" can other parties also avoid retroactive application. *Id.* at 97, 113 S.Ct. 2510.

In *Hartford Underwriters*, the Supreme Court applied its interpretation of § 506(c)

to the parties then before the court. The Court affirmed the dismissal of an administrative claimant's surcharge petition because the claimant lacked standing. This holding must also apply to Calstar's appeal on direct review. *Harper*, 509 U.S. at 97, 113 S.Ct. 2510 (Court's interpretation of federal law given full retroactive effect to all cases open on direct review); *United States v. Newman*, 203 F.3d 700, 701–702 (9th Cir.2000) (civil appeal governed by retroactivity analysis of *Harper*).

## II. Distribution of the Surcharge

■ Under the priority schedule codified in 11 U.S.C. § 507, Calstar's loan to Debtor had priority over Debtor's counsel's claim for fees.[3] The question presented is whether a surcharge under 11 U.S.C. § 506(c) falls within the priority schedule of § 507. Appellee Calstar argues that the surcharge became part of the general assets of the estate and should be distributed according to the statutory priority schedule. Appellants, alternatively, argue that § 506(c) authorizes the party that provided the benefit to the secured creditor to directly receive the reimbursement from the secured collateral regardless of their priority under § 507.

■ We agree with Appellants and hold that a § 506(c) surcharge is not an administrative claim, but an assessment against a secured party's collateral. *In re Mall at One Assoc., L.P.*, 187 B.R. 476, 480 (E.D.Penn.1995). As such, it does not come out of the debtor's estate, but rather comes directly from the secured party's recovery. Consequently, § 506(c) expenses do not fall within the priority scheme of the Bankruptcy Code at all. These expenses "are paid first out of the proceeds of the sale, before a secured creditor is paid." *United States v. Federal*

*Deposit Insurance Corporation*, 899 F.Supp. 50, 55 (D.R.I.1995); *In re Anderson*, 66 B.R. 97, 99 (9th Cir. BAP1986) ("We read the Code to provide for payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors.").

In *In re Palomar Truck Corp.*, this court held that the proceeds of a § 506(c) surcharge pass directly "to the claimant with no gain to the estate." 951 F.2d at 232. As noted above, the Supreme Court overruled *In re Palomar Truck Corp.* on the issue of who has standing to pursue a § 506(c) surcharge. The Court, however, specifically refused to decide how a surcharge recovered by the trustee should be distributed. *Hartford Underwriters*, 530 U.S. at 11 n. 4, 120 S.Ct. 1942. Consequently, we hold that this aspect of *In re Palomar Truck Corp.* survived *Hartford Underwriters* and remains the binding precedent of this Circuit.

The $50,000 surcharge secured by the debtor-in-possession through the settlement agreement should therefore be distributed directly to Debtor's counsel. The basis of the surcharge was, after all, the work of the attorneys. Had the trustee paid its counsel's legal fees prior to seeking a surcharge, the effect would be the same as if the proceeds from the surcharge were distributed directly to Debtor's counsel. Once the trustee has incurred expenses, it may be reimbursed out of secured collateral upon a showing that the expenses incurred were reasonable, necessary and beneficial to the secured creditor. *In re Compton Impressions Ltd.*, 217 F.3d 1256, 1262 (9th Cir.2000). Counsel's right to the proceeds of the surcharge should not depend on a formalistic distinction between whether the debtor ex-

---

**3.** Compensation for professionals is an administrative expense as defined in 11 U.S.C. § 503(b)(2). Calstar's loan was made "with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title." 11 U.S.C. § 364(c)(1).

pended money or simply incurred debt prior to seeking the surcharge. Debtor's counsel should receive the payment to the extent of the benefit provided or, in this case, to the extent agreed to by the secured creditor.

We reject the BAP's conclusion that direct distribution of the surcharge will result in a reordering of the Bankruptcy Code's priority schedule. *In re Debbie Reynolds Hotel & Casino, Inc.,* 238 B.R. 831, 840 (9th Cir.BAP 1999); *See also In re JKJ Chevrolet, Inc.,* 26 F.3d 481, 484 (4th Cir.1994) ("We are of the opinion that if Congress had intended to alter so fundamentally the structure and principles underlying bankruptcy proceedings, it would have done so expressly.").

First, under *Hartford Underwriters,* only the trustee or debtor-in-possession may seek a surcharge. Therefore, in order for a party that provided a benefit to a secured creditor to receive payment for that benefit, the party must convince the trustee to seek a § 506(c) surcharge or get leave from the Bankruptcy Court to do so. *Hartford Underwriters,* 530 U.S. at 13 n. 5, 120 S.Ct. 1942. In many circumstances, this requirement alone will prevent unpaid administrative claimants from seeking refuge in § 506.

In addition, the party seeking the surcharge must prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor. *In re Cascade Hydraulics and Utility Service, Inc.,* 815 F.2d 546, 548 (9th Cir.1987). This is not an easy standard to meet. It is the party seeking the surcharge that has the burden of showing a "concrete" and "quantifiable" benefit. The § 506 recovery is limited to the amount of the benefit actually proven. *In re Compton Impressions,* 217 F.3d at 1261. Because a party seeking a surcharge faces an onerous burden of proof, it is unlikely that creditors will use this provision when any other provision of the Code is available. Furthermore, because the amount of a surcharge is limited to the amount of the benefit and must be proven with specificity, the deserving party is easily ascertainable.

Debtor's counsel avoided these hurdles in the present case by procuring the agreement of the secured creditor to pay the surcharge.[4] In return for the surcharge, RFI received contractual assurances that no other party would seek payment from its secured collateral. After *Hartford Underwriters,* it is unlikely that a secured creditor would be willing to enter into such an agreement. The assurances that constituted Debtor's consideration have no legal effect. RFI agreed to pay $50,000 and received nothing in return. Consequently, the underlying facts of this controversy are unlikely to repeat. There is, therefore, little concern that unsecured creditors can avoid the dictates of the Bankruptcy Code by colluding with secured creditors for the payment of a § 506 surcharge. There is no incentive for secured creditors to enter into such agreements.

### CONCLUSION

*Hartford Underwriters* applies retroactively to this appeal. Under *Hartford Underwriters,* Calstar has no standing to seek a surcharge from RFI. Consequently, the

---

4. The fact that RFI consented to a surcharge in favor of Debtor's counsel supports a finding that the surcharge was properly distributed. William Collier, *Collier on Bankruptcy* ¶ 506.05[6] (15th Ed. Revised 2001) ("If the holder of a secured claim expressly consents to the payment of a specific administrative claim from its collateral, then the secured creditor's consent may be enforceable to ensure payment of the claim of the administrative claimant from the collateral.").

immunizing language of the settlement agreement did not alter the legal rights of Calstar and was properly approved by the bankruptcy court. The BAP decision disapproving the settlement agreement is reversed. In addition, 11 U.S.C. § 506(c) authorizes the payment of the proceeds from a surcharge directly to the party who provided the quantifiable benefit to the secured collateral. The BAP's order directing these proceeds to be distributed according to the priority schedule of 11 U.S.C. § 507 is also reversed.

REVERSED and REMANDED.

**HAVOCO OF AMERICA, LTD.,**
**Plaintiff–Appellant,**

v.

**Elmer C. HILL, Defendant–Appellee.**

**No. 97–2277.**

United States Court of Appeals,
Eleventh Circuit.

July 5, 2001.

J. Nixon Daniel, III, John P. Daniel, Beggs & Lane, Pensacola, FL, for Plaintiff–Appellant.

Thomas Grady Reed, III, Pensacola, FL, Louis K. Rosenbloum, Louis K. Rosenbloum, P.A., John E. Venn, Jr., John E. Venn, Jr., P.A., Pensacola, FL, for Defendant–Appellee.

Before BIRCH and DUBINA, Circuit Judges, and SMITH*, District Judge.

BIRCH, Circuit Judge:

In *Havoco of Am., Ltd. v. Hill,* 197 F.3d 1135 (11th Cir.1999), we certified the following question to the Supreme Court of Florida:

Does Article X, Section 4 of the Florida Constitution exempt a Florida homestead, where the debtor acquired the homestead using non-exempt funds with the specific intent of hindering, delaying, or defrauding creditors in violation of Fla. Stat. § 726.105 or Fla. Stat. §§ 222.29 and 222.30?

*Id.* at 1144. After a thorough review of the question, the Supreme Court of Florida issued the following opinion:

[W]e conclude that we must answer the certified question in the affirmative. The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the excepts only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead.

*Havoco of Am., Ltd. v. Hill,* 790 So.2d 1018 (Fla.2001).

---

* Honorable C. Lynwood Smith, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Accordingly, we AFFIRM the district court's holding that Hill's purchase of a home with non-exempt funds, made with the intent to hinder creditors, does not overcome the Florida homestead exception.

In re FOUR THREE OH, INC., Debtor.

Board of Adjustment of The Township of North Bergen, The, Appellant,

v.

B.A.P.S. Northeast, Inc.; Michael B. Kaplan, Chapter 11 Trustee; Township of North Bergen, The, a Municipal Corporation of the State of New Jersey; Four Three OH Corp.

No. 00–2135.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Feb. 27, 2001.

July 2, 2001.

Gerald J. Monahan, Union City, NJ, for Appellant.

Robert L. Podvey, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, for Appellees.

Before: NYGAARD, ALITO, and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

ROSENN, Circuit Judge:

This appeal has its origin in BAPS's[1] application to the North Bergen Board of Adjustment (BOA or "the Board") for a use variance which would permit BAPS to use the subject property as a temple for Hindu worship. BAPS had agreed to purchase the property from the trustee in bankruptcy for Four Three Oh, Inc. on the condition that it receive approval from the

---

1. BAPS is an acronym. The full name of the organization is Bochasanwasi Shree Akshar Purushottam Swaminarayan Sanstha.

Township of North Bergen for its desired use. The application process dragged on for over two years, and finally culminated in the BOA's insistence that BAPS hire off-duty police officers to direct traffic and insure compliance with the occupancy limit for the temple set by the BOA. The Bankruptcy Court held that this condition was unreasonable and issued an injunction requiring the BOA to allow BAPS to use its own uniformed volunteers for traffic direction and occupancy limit compliance. The BOA appealed this order to the United States District Court for the District of New Jersey, which affirmed. The Board timely appealed to this Court. We also affirm.

## I.

This controversy began in November of 1998, when the United States Bankruptcy Court approved the sale to BAPS of the subject property which previously had been owned by Four Three Oh, Inc., a debtor in Chapter 11 proceedings. The sale of the property, which had been used by the prior owner as a nightclub, was contingent upon BAPS obtaining permission from the BOA to use the land as a house of worship.

BAPS applied to the Township of North Bergen for a Certificate of Occupancy to permit the property to be used as a place of worship. Because the property is located in an industrial zone, the Township denied the application on the ground that a use variance was required under New Jersey law. BAPS then filed an application for the necessary use variance with the BOA, who scheduled the matter for a hearing in January, 1999.

Over the next several months, the BOA repeatedly postponed the hearing. As a result, the Chapter 11 trustee and BAPS jointly commenced an adversary proceeding in the Bankruptcy Court seeking an injunction requiring the BOA to grant BAPS's pending application for a variance. The Bankruptcy Court denied the injunction, but remanded the matter to the BOA for a hearing, ordering it to issue a final decision on the BAPS application by October 6, 1999.

The first remand hearing occurred on September 22, 1999. The BOA heard testimony from several experts, including Derrick McGrath, the BOA's engineer, who identified numerous problems with the site that BAPS needed to address. Most of these problems were later discussed by BAPS's engineer, Bhaskar Halari, who explained that BAPS could and would remedy them. One of the chief problems McGrath identified was the fear that the property had insufficient parking spaces to accommodate its anticipated use. In response to this concern, Kishor Joshi, BAPS's architect, testified that BAPS was willing to limit the temple's occupancy based on the number of available parking spaces.

The number of parking spaces that would be available for worshippers' use is a matter of dispute. Part of the land on which the former nightclub was situated is currently leased to a fast food restaurant (Taco Bell). Although Taco Bell's lease is silent on the issue of parking, Michael Kauker, the North Bergen town planner, had previously testified that, based on the number of seats in Taco Bell, the restaurant was entitled to exclusive use of 27 parking spaces. Joshi accepted this conclusion and calculated that the temple would be left with 165 spaces. He offered to limit the occupancy of the temple to 3.5 persons per parking space, or 578 persons.

The BOA then heard testimony from Michael Maris, BAPS's traffic expert. He testified that he had studied the traffic conditions on the avenue adjacent to the

property and, using a "peak load factor" of .9, he calculated that the property would have a C Level of Service,[2] acceptable under Federal standards. Maris based this calculation on BAPS's agreement to limit itself to 165 parking spaces.

On September 28, 1999, the BOA heard testimony from its own traffic consultant, Hal Simoff. Using the same methodology as Maris, he concluded that the temple's driveways would operate unsafely, with a level of service rating of F. However, Simoff used a peak load factor of .7, which, on cross examination, he conceded was incorrect. He then agreed that a peak load factor of .82 would be more appropriate and would yield a D Level of Service, which Maris testified was still acceptable (under federal standards). Simoff later testified that, based on his reading of the metes and bounds description in the Taco Bell lease, Taco Bell was entitled to 65 parking spaces. Although it received notice of this litigation, Taco Bell never appeared or asserted any claim.

Between the second and final scheduled hearing dates, BAPS wrote a letter to the BOA offering to limit its occupancy to 505 persons, even though the number of available parking spaces would permit a building occupancy of 578 persons under the relevant North Bergen ordinance. Under the ordinance, a building with an occupancy limit of 505 required only 143 parking spaces.

The final hearing on the BAPS application took place on October 6, 1999. Simoff again testified at this hearing, but this time he limited his testimony to BAPS's existing facility in nearby Edison Township. Simoff claimed that BAPS had misrepresented its proposed use of that facili-

ty before the Edison land use board and that BAPS had made architectural changes to the Edison building without first obtaining the requisite municipal approval. However, Simoff once again retracted his testimony on cross-examination when confronted with approved site plans for the Edison facility. These plans proved that BAPS had, in fact, obtained the approval of the township before altering its building.

At the end of the final hearing, the BOA denied BAPS's application for a variance, citing occupancy, traffic, and parking problems. BAPS appealed this decision to the Bankruptcy Court, which reversed the denial, concluding that the Board had acted arbitrarily in refusing to consider reasonable restrictions that would alleviate problems with occupancy, parking, ingress and egress. The Court remanded the application back to the Boar d to consider such restrictions.

On remand, the BOA required, as a condition of granting the variance, that BAPS hire off-duty police officers to monitor traffic entering and exiting its parking lot. This condition was financially burdensome and, as it turned out, impossible to fulfill, because the chief of police later informed BAPS that off-duty officers were not available. The BOA refused BAPS's offer to have its own volunteers perform this function, and BAPS once again brought the matter to the attention of the Bankruptcy Court. This time, the Court held that this condition was arbitrary and unreasonable. It vacated the proposed condition and ordered BAPS's application for a variance approved, allowing BAPS volunteers to monitor the trafficflow in the temple parking lot. The BOA appealed

---

2. A property's "Level of Service" refers to the amount of time it takes a vehicle to exit the driveway. Level of Service A means a delay time of less than ten seconds. Level of Service F, which is generally unacceptable, means a delay time of greater than 50 seconds. The property currently operates with a "B" Level of Service.

this or der to the District Court, which affirmed.

## II.

■ The first question before us is whether the District Court applied the correct standard of review. The District Court reviewed the bankruptcy court's factual findings for clear error, while subjecting its legal conclusions to plenary review. Although this is the standard that normally applies to appeals from bankruptcy decisions, *see In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir.1989), this case reached the District Court in an unusual procedural posture. The Bankruptcy Court had effectively reviewed the decision of the Board of Adjustment, an administrative body created under state law. Under similar circumstances, the Court of Appeals for the Eight Circuit explained the standard of review as follows:

> [W]e are reviewing neither the legal rulings of the bankruptcy court nor its findings of fact. We are reviewing the judgment of a district court affirming a bankruptcy court decision giving effect to a decision of the [administrative agency]. In substance, we are reviewing the decision of an administrative agency.

*Bankruptcy Estate of United Shipping v. General Mills,* 34 F.3d 1383, 1390 (8th Cir.1994). (internal citations omitted).

When a federal court reviews a decision of a state agency, it must grant that agency's factual findings the same degree of deference to which they would be entitled if they were reviewed by a state court. *See AT & T Wireless PCS v. Winston–Salem Zoning Board,* 172 F.3d 307, 315 (4th Cir.1999). If the BOA's decision had been reviewed in the state court system, the Law Division of the New Jersey Supe-

rior Court would have exercised a deferential standard of review. Its review would have been limited to determining whether the BOA's decision was supported by "substantial evidence" and whether it was "arbitrary, unreasonable or capricious." *Pullen v. S. Plainfield Planning Bd.,* 291 N.J.Super. 303, 311–12, 677 A.2d 278, 282 (Law Div.1995) (*"Pullen I"*). The Law Division would have acted as a reviewing court, not a trial court, and would have reviewed the BOA's factual findings based on the record of the proceedings before the BOA. *See Pullen I,* 291 N.J.Super. at 312, 677 A.2d 278.

On appeal, the Appellate Division's review of the Law Division's decision would have been de novo. The Appellate Division would have conducted its own review of the record before the BOA, using the same arbitrary and capricious standard. *See Pullen v. Township of S. Plainfield Planning Bd.,* 291 N.J.Super. 1, 6, 676 A.2d 1095, 1097 (App.Div.1996) (*"Pullen II"*).

In this case, the Bankruptcy Court applied the correct, deferential standard of review, but the District Court did not. When the Bankruptcy Court's decision was appealed to the District Court, the District Court functioned as a second-level reviewing court. Its standard of review should have been plenary. *See, e.g. AT & T Wireless,* 172 F.3d at 314–315; *C.K. v. New Jersey Dept. of Health & Human Services,* 92 F.3d 171 (3d Cir.1996); *Bankruptcy Estate of United Shipping v. General Mills,* 34 F.3d 1383 (8th Cir.1994).

■ In similar cases in which the District Court, functioning in an appellate capacity, applied the wrong standard of review, we have nevertheless reached the merits of the appeal.[3] In light of the

---

**3.** *See, e.g., In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 263 n. 2 (3d Cir.1991) (finding

that the District Court had applied the wrong standard of review when reviewing a Bank-

already long duration of this litigation in the court below, we will not remand but decide the merits. For reasons fully discussed hereinafter, we believe the record of the BOA proceedings reveals that it acted arbitrarily, capriciously and unreasonably in denying the variance sought by BAPS. As we explain in Part III, the District Court did not err in affirming the decision of the Bankruptcy Court.

## III.

 Under New Jersey law, a town planning board should grant a variance for a proposed land use that is "inherently beneficial" if the applicant satisfies a four-prong test. *See Sica v. Board of Adjustment of the Township of Wall,* 127 N.J. 152, 165–66, 603 A.2d 30 (1992). The parties here agree that the proposed temple constitutes an "inherently beneficial" use of the subject property. Accordingly, the *Sica* decision requires the BOA to first identify the public interest involved and then identify the "detrimental effect that will ensue from the grant of the variance." *Id.* at 165–66, 603 A.2d 30. Next, the Board should, when possible, consider reasonable conditions on the use that would reduce its detrimental effect. *See id.* Finally, the Board should "weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Id.* In doing so, the Board should reduce the weight of the

negative criteria to the extent that their effect could be reduced by the imposition of reasonable conditions. *See id.*

 We agree with the District Court and the Bankruptcy Court that the Board failed to seriously undertake the balancing test required by *Sica.* The BOA cited three negative criteria to support its denial of the variance: alleged overuse of the BAPS facility in Edison, a shortage of parking, and traffic problems. The record shows little support for any of these concerns. First, as the Bankruptcy Court noted, there is no evidence in the record, except for Simoff's discredited testimony, to support the allegation that BAPS misrepresented its anticipated use to the Edison board.

The Board also relied on Simoff's admittedly faulty analysis to support the conclusion that BAPS's proposed use of the site would cause traffic problems. Simoff himself conceded that the peak load factor used by BAPS's traffic expert, which led to the conclusion that the Temple would not unduly hamper traffic, was more appropriate than the one he used, and would yield an acceptable Level of Service. Thus, we agree that the Board's reliance on Simoff's traffic calculations was unreasonable.[4]

Furthermore, the Temple's peak hours of operation would fall on Sunday evenings from four to nine p.m. According to Maris's uncontradicted testimony, which was based on his personal knowledge and

ruptcy Court's decision and proceeding to reach the merits of the appeal); *In re Vertientes, Ltd.,* 845 F.2d 57, 58 & 59–60 (3d Cir.1988) (same).

4. The dissent contends that Simoff's error in calculation "related only to the ability of cars to exit the proposed temple's parking lot, leaving unaffected any conclusions about … the ability of cars to enter the lot." (Dis. op. at 16). However, Maris testified that the ability of vehicles to exit the site was the most

critical consideration in analyzing the feasibility of the proposed use. He stated that, because cars attempting to enter the proposed lot only need to make a right turn off Route 1 and 9, "the entering traffic is not critical." He also testified that the number of vehicles attempting to enter the parking lot at the peak entering hour was far lower than the number of cars attempting to exit at the peak exiting hour. Neither of these conclusions has been contradicted.

study of local traffic conditions, Route 1 & 9 is not heavily trafficked during those hours. Maris testified that the traffic problems on Routes 1 & 9 occur during weekday commuter hours. Although BAPS does offer services during those hours, its experience at its Edison facility reflects that week-day services are sparsely attended, usually drawing only 10–15 worshippers.

Finally, the Board's concern about parking also lacks a foundation. Here, again, the Board relied on the testimony of Simoff, a non-lawyer, who opined that, based on his reading of the Taco Bell lease, Taco Bell was entitled to 65 parking spaces. The lease, however, is silent on the issue of parking.[5] Moreover, Simoff's testimony was contradicted by that of North Bergen's own town planner, who testified that Taco Bell needed only 27 spaces, which would leave BAPS with more than enough parking for a temple with an occupancy limit of 505. Finally, we note that, four years ago, this Board approved the use of this very site as a nightclub. Although the nightclub's occupancy limit was 700, the Board expressed no concern over the amount of available parking. The existence of this prior approval calls into question the genuineness of the BOA's conten-

tion that it denied the BAPS application due to inadequate parking.[6]

Even if there were some factual basis for the concerns articulated by the Board, we would still affirm the judgment of the District Court because the Board shirked its duty under *Sica* to seriously consider conditions designed to alleviate any negative impact that would flow from the grant of the variance. The record reveals that BAPS proposed numerous conditions, from reducing the size of its prayer hall to reducing the occupancy limit of its temple, which should have quieted the Board's concerns about over-use, parking and traffic. The Board rebuffed all of these proposals for no apparent reason. Its president simply concluded that "no organization would voluntarily limit its membership."[7]

Finally, we also note that the Bankruptcy Court vacated the condition that the Board ultimately chose to impose on BAPS's use of the site, the hiring of off-duty police officers at BAPS's expense to direct traffic and monitor compliance with the occupancy limit. We agree with the Bankruptcy Court that this condition was arbitrary and unreasonable. The Board refused to allow BAPS's own volunteers to direct traffic and monitor occupancy, con-

---

5. We also note that, although Taco Bell has received notice of the existing action, it has not appeared to defend its right to any parking spaces.

6. The dissent asserts that the BOA approved the use of the site as a nightclub because a nightclub attracts patrons "late at night when street parking may be more available and trafficflow is lighter." (D.C. at 18) This is pure speculation. Nothing in the record suggests that parking on Route 1 and 9 is available late at night, but not on Sunday evenings. Moreover, contrary to the dissent's suggestion, Maris testified that entry into and exit from the parking lot would be more evenly spread throughout the temple's hours of operation than would entry to and exit from a

church or synagogue. He stated that, at BAPS's temple in Edison, "people kept coming in throughout the day."

7. The dissent believes that it was reasonable for the BOA to question whether BAPS would be willing to turn people away at the door once 505 people had entered the temple if there was room for more. (Dis. op. at 17). On the contrary, it is unreasonable and unfair for the BOA to postulate in the absence of any evidence that BAPS would violate its agreement to limit occupancy. Occupancy limits are quite common in dance halls, dining rooms, elevators and other structures. Besides, if BAPS were to violate this condition of the variance, the Township has a legal remedy by injunction or rescission of the variance.

cluding that they could not be trusted to do so. We believe that this conclusion, which has no basis in the record, further supports the Bankruptcy Court's decision that the Board acted arbitrarily and unreasonably in denying the variance.

### IV.

In sum, we agree with the Bankruptcy Court that the Board acted arbitrarily and unreasonably. The judgment of the District Court will be affirmed. Costs taxed against appellant.

ALITO, Circuit Judge, dissenting:

I respectfully dissent for two reasons. First, unlike the majority, I do not think that the decision of the Board of Adjustment ("BOA") denying the variance was arbitrary or capricious. Second, I do not believe that the Bankruptcy Court's Opinion vacating the condition that the BOA ultimately chose to apply—the hiring of off—duty police officers—is properly before us for review.

### I.

The New Jersey Legislature has delegated the power to grant or deny variances to local boards of adjustment. *See* N.J. Stat. § 40:55D–70. However, the Legislature has restricted that power in the following manner:

> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance.

N.J. Stat. § 40:55D–70(d) (2000).

In other words, a board must deny a variance if it finds either that the variance would ultimately result in a "substantial detriment to the public good" or that the variance would "substantially impair the intent and purpose of the zone plan and zoning ordinance." In this case, the BOA unanimously found that denial of BAPS's application was mandated by the parking and traffic problems that granting the variance would cause. P.A. 451.

"Review of the decision of a board of adjustment ... begins with the recognition that the board's decision is presumptively valid and is reversible only if arbitrary, capricious, and unreasonable. Underlying the presumption is the recognition that such boards possess special knowledge of local conditions and must be accorded wide latitude in the exercise of their discretion." *Sica v. Bd. Of Adjustment,* 127 N.J. 152, 166–67, 603 A.2d 30, 37–38 (1992) (citations omitted). "[A] reviewing court [may not] 'suggest a decision that may be better than the one made by the ... planning board,' we merely 'determine whether the board could reasonably have reached its decision.'" *Pullen v. Township of S. Plainfield Planning Bd.,* 291 N.J.Super. 1, 6–7, 676 A.2d 1095, 1097 (App.Div.1996) (quoting *Davis Enters. v. Karpf,* 105 N.J. 476, 485, 523 A.2d 137, 141 (1987)). Moreover, the bur den on a party is even greater when challenging the denial of a variance than when challenging the approval of a variance. *See Nynex Mobile Communications Co. v. Hazlet Township Zoning Bd. of Adjustment,* 276 N.J.Super. 598, 609, 648 A.2d 724, 730 (App.Div.1994) (citing *Cerdel Constr. Co. v. Township Comm.,* 86 N.J. 303, 430 A.2d 925 (1981)). "Thus, an applicant bears a heavy burden in overcoming a denial." *Id.*

The majority rejects the BOA's two main reasons for denying the variance—a shortage of parking and traffic problems—holding that "[t]he record shows little sup-

port for ... these concerns." Maj. at 113. The record, however, contains more than sufficient evidence for the BOA's decision to withstand review.

BAPS does not contend that it was inappropriate for the BOA to consider parking and traffic problems in making its decision on the variance. *See Price Co. v. Zoning Bd. of Adjustment,* 279 N.J.Super. 327, 331–32, 652 A.2d 784, 787 (Law Div.1993). Nor does BAPS contend that the BOA acted unreasonably in refusing to grant its application for a variance as it was initially presented to the BOA. Rather, BAPS challenges the BOA's refusal to accept its proposal to limit occupancy to 505 people as a solution to the detrimental effects of the proposed temple—a temple still capable of accommodating 1500–1600 people.[1] P.A. 253.

Under the *Sica* test, the BOA was first required to "reduce the detrimental effect [of granting the proposed variance] by imposing reasonable conditions on the use .... [and] then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Sica,* 127 N.J. at 166, 603 A.2d at 37. The BOA rejected the proposed occupancy limit as an invalid "reasonable condition on the use" for three reasons. The BOA determined (1) that the proposed conditions did not sufficiently eliminate the parking and traffic problems; (2) that BAPS would be unable to impose the proposed conditions effectively; and (3) that

BAPS would be unlikely to adhere to the proposed conditions. Each of these reasons is supported by substantial evidence and thus provides an adequate basis for the BOA's denial of the variance.

i.

First, the BOA reasonably found that, even with the occupancy limit of 505, the proposed BAPS temple would cause a substantial detriment to the public good with respect to parking and traffic. *See Price Co. v. Zoning Bd. of Adjustment,* 279 N.J.Super. 327, 328–29, 652 A.2d 784, 785 (N.J.Super. Ct.1993).

Testifying about parking, the BAPS expert, Michael Maris, and the BOA's expert, Hal Simoff,[2] agreed that the temple would need one parking space for approximately every 3.3 occupants. P.A. 131; 264. Thus, the temple would need 153 spaces to accommodate 505 people. The parking lot that the proposed temple site shares with a Taco Bell has a total of 193 spaces. Therefore, if Taco Bell owns only 27 spaces, as BAPS contends, there was enough parking for 505 people; conversely, if Taco Bell owns 64 spaces, as the BOA contends, then enough parking does not exist.

The only testimony as to the number of parking spaces that Taco Bell owns came from Simoff, who opined, based on his examination of the Taco Bell lease and his measurements of the property, that Taco Bell owns 64 spaces. P.A. 261–62. BAPS's figure of 27 spaces is based entire-

1. Notably, while BAPS proposed to limit the occupants to 505 people and to rearrange the interior of the temple so that the prayer hall would be suitable for 505 people, BAPS never offer ed to reduce the overall square-footage of the temple, which would still remain capable of holding 1500–1600 people. The majority apparently holds that the BOA's decision to focus on the gross square footage of the temple rather than on the square footage of

the prayer hall alone was arbitrary and capricious. I find no support for the conclusion that no reasonable person could focus on the gross capacity of the temple.

2. The BOA hired Simoff to study the parking and traffic effects of the proposed temple and to make an independent recommendation on whether the variance should be granted.

ly on the testimony of Town Planner Michael Kauker, who stated that Taco Bell "could use 27 spaces"—which meant that the zoning laws would be satisfied if Taco Bell had a minimum of 27 spaces. P.A. 11–12. This fact has little logical relationship to the number of spaces that Taco Bell owns and thus does not undermine Simoff's testimony.

The majority dismisses Simoff's testimony on this point partly because he is not a lawyer and because Taco Bell has "not appeared to defend its right to a certain number of parking spaces." Maj. at 113 fn.5. Simoff's lack of a law degree was a fact that the BOA could have considered in assessing the weight to assign to his opinion, but this fact did not make it unreasonable for the BOA to accept his testimony. Moreover, I fail to see the significance for present purposes of Taco Bell's failure to appear in the federal court proceedings. Taco Bell is not bound by the decision in this case, and it is not difficult to think of business reasons why it might have chosen not to appear.

As for traffic, Simoff and Maris disagreed over the ability of Route 1 & 9, a state highway, to absorb the traffic that the temple would generate. The BOA President reasonably worried that Route 1 & 9 "is a heavily trafficked road.... It will be a mess. [Cars] will be lined up on[Route 1 & 9], trying to get in.". P.A. 447. Another BOA member noted that when discussing "[Route] 1 & 9, you're talking a state highway. It's treacherous. Exiting and entering anywhere on [Route

1 & 9] for one car, you're taking your life in your hands." P.A. 448–49.

The BOA heard conflicting expert testimony on the impact that the proposed temple would have on traffic. Simoff testified that the traffic volume along Route 1 & 9 at the temple site during peak midday hours was 1600 vehicles/hour. P.A. 228. He further testified that the temple would generate 168 vehicles/hour exiting during peak time. P.A. 231. According to Simoff's computer modeling, under these conditions, Route 1 & 9 at the temple driveway would operate at Level of Service F.[3] P.A. 236. Simoff characterized this level of service as "unacceptable under any conditions." P.A. 237.

Maris agreed that Level of Service F is unacceptable, but he testified that, with the temple, the Level of Service would be "C"—a negative impact of only one service level from its current service level of "B." P.A. 144–45. Maris characterized this as "an acceptable impact on traffic." P.A. 145.

The majority holds that it was unreasonable for the BOA to accept Simoff's testimony because, on cross-examination, Simoff admitting making a minor error in calculation. The main difference between Simoff's conclusion and Maris's came from their use of different "peak hour factors"[4] —Simoff testified that he used a peak hour factor of .7 in his calculations, P.A. 292, while Maris testified that he used a peak hour factor of .91. P.A. 148. Simoff admitted on cross-examination that the correct peak hour factor was .82—barely clos-

---

**3.** Planners refer to "Levels of Service" when measuring the traffic flow of a road and its corresponding ability to accept traffic entering from a driveway or connecting roadway. Level of Service A means that the average delay for a vehicle waiting to enter is less than 10 seconds per vehicle, and Level of Service F means that the delay is greater than

50 seconds per vehicle. P.A. 144–45; 236–37.

**4.** The "peak hour factor" is a factor used in the calculation of a road's level of service. The peak hour factor compensates for the fact that cars will not attempt to exit a driveway uniformly throughout the peak hour. P.A. 149.

er to that used by Maris than to that used by Simoff. P.A. 293–94. Nevertheless, using the correct peak hour factor, Simoff calculated the entryway would still be classified as Level of Service D. P.A. 294.

Weighing witness credibility is the province of the BOA,[5] and the BOA was entitled to accept Simoff's opinion despite his initial error. Simoff admitted that neither he nor Maris used the correct peak hour factor in their application, and that the real peak hour factor lay somewhere in between, only slightly closer to Maris's number than to his own. Moreover, the error would not have changed his ultimate conclusion. Lastly, the error in calculation related only to the ability of cars to exit the proposed temple's parking lot, leaving unaffected any conclusions about the capacity of the parking lot or the ability of cars to enter the parking lot. Under these circumstances, Simoff may have been slightly "discredited," as the majority claims, but I do not believe that it was unreasonable for the BOA to accept any of Simoff's testimony, as the majority effectively holds. *See Todd v. Sheridan,* 268 N.J.Super. 387, 400, 633 A.2d 1009, 1016 (App.Div.1993) ("The finder of fact is free to accept all, some, or none of an expert witness's opinion."). Moreover, accepting Simoff's revised testimony, I do not believe that the Board unreasonably decided that a decrease from Level of Service B to Level of Service D constituted a substantial detriment to the public good.

### ii.

Second, the BOA reasonably questioned whether BAPS could adhere to the proposed restriction. The BOA President worried that "it would not be feasible to tell a person that he or she could not attend services." P.A. 448. This concern is neither arbitrary nor capricious. Under *Sica,* the BOA is required to consider only "reasonable conditions." *Sica,* 127 N.J. at 166, 603 A.2d at 37. A condition that is not feasible certainly does not qualify as a reasonable condition.

The majority does not address the specifics of how BAPS will prevent more than 505 people fr om attempting to come to services. If the number of cars coming to the temple site exceeds the number of parking spaces, it is predictable that some people who wish to attend services and who know that there is space for them in the temple will park their cars illegally on adjoining streets and then walk to the temple. This would create a very dangerous situation. P.A. 227–28.

Simoff recommended that the variance be granted if BAPS would reduce the square footage of the temple to a size suitable for an occupancy of approximately 450 people. P.A. 299 & 398–400. However, none of BAPS's proposals show a willingness to reduce the size of the temple. Thus, even if enough parking existed on the site for an occupancy limit of 505, it was not unreasonable for the BOA to reject the limitation of occupancy as not being a "reasonable condition."

### iii.

Third, the BOA reasonably questioned whether BAPS would adhere to the proposed restriction. The BOA President doubted whether BAPS "would voluntarily limit its membership." P.A. 448. It was reasonable for the BOA to question whether BAPS would be willing to turn people away at the door once 505 people had entered the temple, even though there

---

**5.** *See Beverly Calif. Corp. v. NLRB,* 227 F.3d 817, 830 (7th Cir.2000); *Hambsch v. Department of the Treasury,* 796 F.2d 430, 436 (C.A.Fed.1986); *Baghdikian v. Bd. of Adjustment,* 247 N.J.Super. 45, 48–49, 588 A.2d 846, 848 (App.Div.1991).

would still be room for 995 to 1095 attendees.

In questioning BAPS's willingness to do this, the BOA only partially relied on Simoff's testimony regarding the alleged over-occupancy of BAPS's temple in Edison. The BOA President made the common-sense comment that "I, for one, do not believe that any organization would voluntarily limit its membership." P.A. 447. In other words, he doubted BAPS's willingness to turn away people who wished to enter the temple to worship even though there was plenty of room for them inside. This view was well within the bounds of reason.

The majority questions the BOA's sincerity because the BOA previously granted a variance for the operation of a nightclub on the same property. Maj. at 113. However, as far as I am aware, BAPS itself has never questioned the BOA's motives. I would view this case quite differently if there were any suggestion that the BOA harbored any bias towards BAPS or its members, but I am aware of no such evidence. Furthermore, the parking and traffic concerns associated with a nightclub can be very different from those associated with a house of worship. The temple's main services would be on Sunday, with other services on weekday afternoons. See P.A. 177–78 (BAPS's schedule of services). A nightclub would normally draw patrons only late at night, when parking may be more available and traffic flow is lighter. Also, it is likely that the arrival and departure of patrons of a nightclub would be more evenly spaced over its hours of operation, whereas the proposed

BAPS temple could generate mass entry and exodus at specific times. In any event, we do not have before us the record concerning the BOA's previous grant of a variance, making it impossible to draw conclusions as to propriety of an analogy between the nightclub and the proposed temple.[6]

## II.

I also note that the BOA's later decision to impose the condition of hiring off-duty police officers at BAPS's expense to monitor traffic is not properly before us. The BOA imposed the condition on December 1, 1999, a week after filing the notice of appeal to the District Court in this case. The Bankruptcy Court subsequently vacated the condition on January 7, 2000. The BOA has not appealed that decision, nor does it raise the issue in its brief. See Brief of Appellant at 14 (disavowing a challenge to the Bankruptcy Court's order vacating the condition). Indeed, the majority's conclusion that there is nothing in the record to support the condition is self-evident, since the Board was ordered by the Bankruptcy Court to begin considering reasonable conditions on November 29, 1999, whereas we have no record before us concerning any BOA actions or meetings occurring after October 9, 1999.

## III.

In sum, the majority disregards the long-standing proposition that "[a]n abuse of discretion does not exist simply because we disagree with the [finder of fact's] decision." *Barnes Foundation v. Township of*

---

6. The Majority implies that it was per se unreasonable for the Board to rely upon common knowledge as well as its weighing of the credibility of the BAPS petitioners to reach the conclusion that BAPS would probably not adhere to the occupancy limit. Maj. at 113 n. 7. If this were the case, then it would form the basis for a blanket rule that, no matter how preposterously low the proposed occupancy limit was when compared to the designs of and intended use for the building, a Board of Assessment must accept a petitioners proposed occupancy limit. This cannot be the case.

*Lower Merion*, 242 F.3d 151, 167 (3d Cir. 2001) (Nygaard, J., dissenting). " 'Abuse' itself is a serious accusation and in using the term 'abuse' to define our standard of review, our jurisprudence has recognized the institutional superiority of the [finder of fact]. Therefore, we should not readily discard its findings and conclusions." *Id.*

Because I believe that the BOA's decision is supported by substantial evidence and is not arbitrary or capricious, I would reverse the decision of the District Court and sustain that of the BOA.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Scott P. LOWELL, Defendant–
Appellant.

No. 00–4191.

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 11, 2000.[1]

Decided June 20, 2001.

1. After an examination of the briefs and the record, we have concluded that oral argument is unnecessary, and the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a); Cir. R. 34(f).