In re PEGASUS GOLD
CORPORATION,
Debtor.

Harrison J. Goldin, in his capacity as Liquidating Trustee for the Pegasus Gold Corporation Liquidating Trust, and Reclamation Services Corporation, Plaintiffs,

v.

The State of Montana; the State of Montana Department of Environmental Quality; the State of Montana Department of Administration, Risk Management Division; the Attorney General of the State of Montana; Spectrum Engineering, Inc., Defendants.

Bankruptcy No. 98–30088.
Adversary No. 00–3070.

United States Bankruptcy Court,
D. Nevada.

March 29, 2002.

Armstrong–Miller, LLP, Sally B. Armstrong, Edmond "Buddy" Miller, Reno, NV, Doney, Crowley, Bloomquist & Uda, P.C., Michael J. Uda, Helena, MT, Mayer, Brown & Platt, Michael P. Richman, David M. Hillman, New York City, for Plaintiffs.

Timothy A. Lukas, Robert C. Vohl, Hale, Lane, Peek, Dennison, Howard and Anderson, Reno, NV, Michael F. McMahon, Hughes, Kellner, Sullivan & Alke, Helena, MT, G. Martin Tuttle, Special Ass't Attorney General, Montana Department of Environmental Quality, Helena, MT, Clay Smith, Ed Nolde, Assistant Attorney General, Office of the Attorney General, Helena, MT, for Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

GREGG W. ZIVE, Chief Judge.

### I. PROCEDURAL HISTORY

The State of Montana, State of Montana Department of Environmental Quality, State of Montana Department of Administration, Risk Management Division, the Attorney General of the State of Montana ("Montana Defendants"), and Spectrum Engineering, Inc. ("Spectrum") (or collectively "Defendants") filed Motions to Dismiss Plaintiffs' Adversary Complaint that was filed March 7, 2000, by plaintiffs Harrison Goldin, Liquidating Trustee for the Pegasus Gold Corporation Liquidating Trust ("PGC Trustee") and Reclamation Services Corporation ("RSC") (or collec-

tively "Plaintiffs"). An Amended Complaint was filed June 30, 2000, pursuant to which the only remaining Montana Defendants were the State of Montana and the Montana Department of Environmental Quality ("DEQ"). Appearing on behalf of Plaintiffs were Michael Richman, Esq., and David Hillman, Esq., of Mayer, Brown & Platt, and Edmond Miller, Esq., of Armstrong Miller. Appearing on behalf of Defendants were Montana Solicitor General Clay Smith, Esq., and Timothy Lukas, Esq., of Hale, Lane, Peek, Dennison, Howard and Anderson.

Plaintiffs seek to recover compensatory and punitive damages from Defendants for the alleged breach of various agreements and plan of reorganization provisions regarding reclamation and water treatment issues. Defendants' motions challenge Plaintiffs' jurisdictional basis for bringing the Adversary Proceeding in the Nevada bankruptcy court on Eleventh Amendment and other grounds.

Following the filing of opposing, reply and supplemental memoranda of points and authorities, declarations and exhibits, the court conducted a hearing on October 2, 2000. While under advisement, the court and the parties knew of cases that had just been decided at various levels of the federal judicial system that involved the significant issues raised by Defendants' motions. Subsequent to oral argument, the parties submitted additional memoranda of law regarding decisions by trial courts, district court appeals, and circuit courts that dealt squarely with the issues before this court. Specifically, in *In re Lazar*, 237 F.3d 967 (9th Cir.2001), certiorari was requested. Since the rationale and holding of that opinion were critical to the analysis in this case, this court waited to see how the U.S. Supreme Court would treat *In re Lazar*. Certiorari was denied on October 29, 2001.

## II. FACTUAL HISTORY

On January 16, 1998, PGC and eighteen of its affiliates (collectively "Debtors") commenced voluntary Chapter 11 proceedings. As part of the bankruptcy cases, the DEQ filed certain proofs of claim against Debtors. The DEQ was a very active and principal participant throughout the course of the bankruptcy proceedings, including objecting to Debtors' disclosure statement and participating in numerous evidentiary hearings and arguments regarding various complex settlements and, ultimately, Debtors' plans of reorganization.

Debtors and the DEQ participated extensively in the lengthy and extensive negotiations regarding the financial responsibility for reclamation and water treatment work at two mines in Montana ("Zortman Sites"). These negotiations involved not only Debtors and the DEQ, but the Official Committee of Unsecured Creditors, the various surety entities, the United States Department of Justice and other parties in interest. The negotiations involved both judicial and non-judicial settlement conferences, objections to the proposed disclosure statement and amendments thereto, negotiations with sureties, and objections to and active participation in the plan confirmation process. After months of exhaustive negotiations, Debtors and the DEQ reached an agreement ("Zortman Agreement"), which was approved by this court on December 22, 1998, shortly before the Second Amended Joint Liquidation Plan of Reorganization of Pegasus Gold Corporation et al ("Plan") was confirmed on December 28, 1998.

The Zortman Agreement and Plan provide that Debtors would create a new entity, Reclamation Services Corp. ("RSC"), which would use Debtors' employees to perform the reclamation and water treatment services at the Zortman Sites on an interim basis after plan confirmation.

RSC was formed pre-confirmation on December 17, 1998, and was specifically incorporated into the Plan. The use of RSC for the interim reclamation and water treatment work was to benefit the overall Plan goal of maintaining employment of Debtors' employees and thus maximizing the possibility of creditor recovery. As part of the agreement, the DEQ required that Debtors and the Official Committee of Unsecured Creditors pay the DEQ $1,050,000 to fund the interim work. The DEQ also made it clear that it would submit the work out for a competitive bid, for which RSC would have the opportunity to compete.

Though the exact length of the interim period was never firmly established, in reality it was short. By mid-June 1999, less than six months after Plan confirmation, billing disputes began to arise and on June 24, 1999, the DEQ terminated RSC and hired a new company, Spectrum, to perform the reclamation work. RSC went out of business shortly thereafter.

Plaintiffs commenced this adversary proceeding on March 7, 2000, and the Amended Complaint alleges eleven claims for relief ("Claims"), including, breach of the Plan and related agreements; breach of the covenant of good faith and fair dealing; fraud in the inducement; unjust enrichment; estoppel; tortious interference with third party relations; intentional interference with prospective economic advantage; conversion; and defamation. Defendants seek to dismiss the complaint pursuant to Fed. R. Bankr.P. 7012(b)(1) and (6), which incorporate Fed.R.Civ.P. 12(b)(1) and (6), contending this court no longer has subject matter jurisdiction, that the DEQ is protected by sovereign immunity under the Eleventh Amendment to the U.S. Constitution and that the allegations have not been pleaded with particularity as required by Fed. R. Bankr.P. 7009(b).

## III. JURISDICTIONAL ISSUES

Defendants argue this court does not have jurisdiction over the claims asserted by RSC on the basis that once the Plan was confirmed, this court was divested of subject matter jurisdiction and that any jurisdictional powers this court may yet retain are inapplicable to the claims of RSC. Spectrum further contends that since all of Spectrum's alleged misconduct occurred post-confirmation, Spectrum has no relationship with this bankruptcy case whatsoever. Both defendants argue that RSC's claims do not fall under the "related to" jurisdiction afforded to bankruptcy courts by 28 U.S.C. § 1334(b), and that the supplemental jurisdiction provided for in 28 U.S.C. § 1367 may not be employed by a bankruptcy court.

RSC argues this court has jurisdiction over Claims One and Two as either "arising under" or "related to" the bankruptcy case under § 1334(b) and § 157(b)(2); over Claims Three through Eight by its "related to" jurisdiction; and over Claims Nine through Eleven pursuant to § 1367 supplemental jurisdiction.

### A. Sec. 1334(b) Jurisdiction and Claims for Relief One Through Eight

 "The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); *see also Falise v. American Tobacco Co.*, 241 B.R. 48, 56 (E.D.N.Y. 1999). This court's subject matter jurisdiction is governed by 28 U.S.C. § 1334. Section 1334(b) grants jurisdiction to the district court over three broad types of bankruptcy-related proceedings: (1) those "arising under" Title 11; (2) those "arising in" a bankruptcy case; and (3) those "related to" a bankruptcy case. This jurisdic-

tion can be referred to the bankruptcy court under 28 U.S.C. § 157(a), which states that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." The District Court of Nevada has referred to this court its jurisdiction under § 1334, as provided by LR 1001(b)(2).

RSC asserts this court has jurisdiction over its first and second claims for relief because they require resolution of matters "arising in" bankruptcy or, in the alternative, because the claims are "related to" the bankruptcy case. Because this court has at least "related to" jurisdiction over Claims One through Eight, it is not necessary to determine whether or not claims One and Two are matters "arising in" bankruptcy. Nevertheless, Claims One and Two involving breach of the Plan and the Zortman Agreement appear to state a claim based upon this court's core jurisdiction of 11 U.S.C. § 157(b)(2)(A) and § 157(b)(2)(L).

 *Pacor, Inc. v. Higgins* is perhaps the leading case regarding the breadth of "related to" jurisdiction. 743 F.2d 984 (3d Cir.1984), *overruled on other grounds by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 134–35, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995). Its reasoning and holding regarding § 1334(b) has been adopted by the Ninth Circuit[1] in *In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988), and approved of by the United States Supreme Court in *Celotex,* 514 U.S. at 308, 115 S.Ct. 1493. Citing both legislative history and case law, the Third Circuit in *Pacor* found that "[i]n enacting [§ 1334(b)[2]], Congress intended to grant comprehensive jurisdic-

tion to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected to the bankruptcy estate." 743 F.2d at 994. Although "related to" jurisdiction is certainly not limitless, Congress' choice of words "suggests a grant of some breadth." *Celotex,* 514 U.S. at 307–08, 115 S.Ct. 1493. The scope of "related to" jurisdiction was not defined by Congress, but "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor,* 743 F.2d at 994. Consequently, the related proceeding "need not necessarily be against the debtor or against the debtor's property," as long as its outcome could possibly alter "the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Id.*

### 1. The DEQ and "related to" jurisdiction

 Defendants assert this court cannot possibly have any "related to" jurisdiction "for the simple reason that there is no longer a bankruptcy estate to be administered." Reply in Support of Motion to Dismiss, at 15. The Plan has been confirmed and the DEQ argues that "it is doubtful that any form of 'related to' jurisdiction applies in the post-confirmation context at all." Such a sweeping concept, however, would effectively strip a bankruptcy court of the ability to enforce its own orders, as permitted by 11 U.S.C. § 105(a). The relationship between Plain-

---

1. As of 1995, the *Pacor* test had also been adopted by the First, Fifth, Sixth, Eighth, Tenth, and Eleventh circuits. *Celotex,* 514 U.S. at 308, n. 6, 115 S.Ct. 1493.

2. Formerly § 1471(b).

tiff and Defendants was pervasive throughout the pre-confirmation bankruptcy proceedings, the Zortman Agreement was negotiated contemporaneously with the Plan, and the participation of RSC was incorporated directly into the Plan itself. Thus, any allegations that Defendants have violated their obligations are "related to" the bankruptcy cases.

 The DEQ relies upon *In re Fairfield Communities, Inc.,* 142 F.3d 1093 (8th Cir.1998), to support its claim that the bankruptcy court has no post-confirmation jurisdiction. However, the confirmation of a plan does not automatically terminate the jurisdiction of a bankruptcy court. *See In re Sultan,* 81 B.R. 599, 601–02 (9th Cir. BAP 1987) (holding post-confirmation attorney fees compensable as administrative expense pursuant to the court's retention of post-confirmation jurisdiction). *Fairfield* stands for the proposition that the debtor's estate generally ceases upon confirmation of a plan. *See also Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 587 (9th Cir.1993). However, as noted by the DEQ, the *Fairfield* court also discusses an exception to this general rule—when a plan or order confirming a plan provides that a bankruptcy court retains jurisdiction over the administration and interpretation of a plan. *Id.* at 1095. A bankruptcy court has post-confirmation jurisdiction to protect its confirmation decree, to prevent interference with the execution of a plan and to otherwise aid in a plan's operation and compliance. *Falise v. American Tobacco Co.,* 241 B.R. 48, 57 (E.D.N.Y. 1999).

The Plan in this case explicitly retained jurisdiction for this court "[t]o construe and to take any action authorized by the Code and requested by such Debtor, the Liquidating Trustee *or any other party in interest* to enforce this Plan and the documents and agreements filed in connection with this Plan, issue such orders as may be necessary for the implementation, execution and consummation of this Plan" (emphasis added). Art. X, § 10.1(b). Moreover, Art. X, § 10.1(e) provides that this court retained jurisdiction "to resolve any dispute regarding implementation or interpretation of the Plan until the bankruptcy case is closed." These Plan provisions are material terms of the plan, and there has been no final decree nor has the case been closed.

While some of the factual allegations in the Amended Complaint relate to post-confirmation events, the reclamation issues, RSC creation and the Zortman Agreement demonstrate that the very issues raised in the Amended Complaint were confronted and supposedly resolved pre-confirmation by the DEQ and Debtor. The Plan contemplated and provided a jurisdictional basis for the resolution of disputes pertaining to Plan implementation, enforcement, administration, compliance and interpretation.

 Proceedings involving estate administration can arise post-petition. *In re Best Products Co., Inc.,* 68 F.3d 26, 31 (2d Cir.1995) (allowing enforcement of a subordination agreement provided for in a confirmed plan of reorganization). Of course, this court explicitly retained jurisdiction over Plan compliance, implementation and enforcement. Art. X, § 10.1(b) and § 10.1(e). *See generally Fairfield Communities., Inc.,* 142 F.3d at 1095; *Falise,* 241 B.R. at 57. The creation of RSC as a result of the parties' negotiations and its incorporation into the Plan is in accord with 11 U.S.C. § 1123(a)(5), which requires a plan to provide adequate means for its implementation, including entities organized before or after plan confirmation. § 1123(a)(5)(B). If those entities are necessary for plan implementation they must have standing to enforce the applicable

plan provisions, otherwise a plan would fail to satisfy the mandate of 11 U.S.C. § 1123(a)(5).

■ The First, Second, and Seventh claims are related to the bankruptcy cases because they involve interpretation, implementation and enforcement of DEQ's obligations under the Plan and Zortman Agreement, possible disgorgement of estate funds paid to the DEQ in accordance with those agreements, and the potential rescission of the agreed-upon treatment of DEQ's claims in the bankruptcy cases. Resolution of these claims could also directly impact the recoveries of PGC's unsecured creditors. *Cf. Falise*, 241 B.R. at 57 (noting that "a civil proceeding which has [1] no effect on the debtor or which would not impact upon [2] the administration of the bankruptcy case, or [3] on the property of the estate, or [4] on the distribution to creditors, cannot find a home in the district court based upon its bankruptcy jurisdiction'") (quoting Collier on Bankruptcy, ¶ 3.01[4][c][v], at 3–30 (15th ed.1999)).

■ Claims Three through Six are related to the bankruptcy cases because they involve DEQ's alleged failure to honor its obligations to pay RSC for work performed at the Zortman Sites. RSC was created in contemplation of the Plan itself, which provides that "reclamation, remediation and closure activities at [the Zorman Sites] will be performed by a newly formed Reclamation Services Company." Article I, § 1.87. Section 1.88 states that RSC would be a "newly formed corporation . . . to perform mine reclamation work on a contract basis." Article VIII, § 8.1, "Reclamation Service Company," further expands on the role of RSC. DEQ's relationship with RSC did not suddenly appear post-confirmation; indeed, RSC was created prior to Plan confirmation and incorporated into it at least in part *because of* the DEQ and the planned work to be done.

■ Finally, Claim Eight is related to the bankruptcy cases because it alleges interference by the DEQ with the relationship of RSC and its employees. These employees were an essential part of RSC which, as detailed above, was created as an integral part of the Plan, and the transfer of the employees from the Debtors to RSC was directly related to the Plan objective of maintaining employment for these individuals. Thus, Claims One through Eight are "related to" the bankruptcy cases pursuant to § 1334 and this court does have subject matter jurisdiction. Each of the disputes has a close nexus to the bankruptcy case, involves administration, compliance, enforcement or implementation of the Plan, impacts the potential distribution to the Debtors' unsecured creditors, and jurisdiction was specifically retained to resolve disputes of this nature.

### 2. Spectrum and "related to" jurisdiction

■ Only RSC's Claims Eight and Ten are against Spectrum and Spectrum argues this court has no jurisdiction over Claim Eight because the Plan has been confirmed and Spectrum was not explicitly part of the Plan. RSC contends this court has jurisdiction over Claim Eight pursuant to § 1334(b) and over Claim Ten pursuant to § 1367 supplemental jurisdiction. Supplemental jurisdiction and § 1367 are discussed at Sec. III(B), *infra.*

While *Donaldson v. Bernstein* does state that the jurisdiction of the bankruptcy court does not extend indefinitely, particularly after the confirmation of a "plan and the closing of a case," 104 F.3d 547, 553 (3d Cir.1997), the distinction here is that these cases are not closed. Furthermore, *Donaldson* held that the bankruptcy court was entitled to exercise jurisdiction where a closed case had been reopened, long after plan confirmation, because the

trustee was basically "seeking to carry out the intent of the reorganization plan." *Id.* In performing its jurisdictional analysis, the Third Circuit found that, in order for jurisdiction to exist, a court "need only determine whether a matter is at least related to the bankruptcy.'" *Id.* at 552 (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir.1991) (citations omitted)). The *Donaldson* court also distinguished the facts of that case from those cases limiting a bankruptcy court's jurisdiction, *id.* at 553–54, and those distinctions also exist in the instant matter. Unlike those cases in which jurisdiction was not found, this adversary proceeding has a close nexus to the bankruptcy cases because here Plaintiffs are attempting to implement and enforce the Plan consistent with its provisions. Also, as in *Donaldson*, this adversary proceeding implicates the integrity of the bankruptcy process because the Defendants' alleged conduct affects Plan enforcement and contemplated distribution.

While it is true that a bankruptcy court does not have jurisdiction over claims that have nothing whatsoever to do with construction, interpretation, implementation or compliance with a plan, *see, e.g., In re Haws*, 158 B.R. 965, 970 (Bankr.S.D.Tex. 1993), here RSC was created in direct contemplation of the Plan and its role was central to the Plan's implementation. Whether Spectrum tortiously interfered with RSC's relationship with its employees (Claim Eight) directly relates to Art. I, § 1.88 and Article VIII, § 8.1 of the Plan. Thus, the claims against Spectrum are sufficiently related to the bankruptcy case and fall under this court's jurisdiction.

Spectrum finally asserts that RSC has failed to allege that it is attempting to enforce the terms of the Plan. RSC, however, was created as an integral part of the Plan to perform certain reclamation work. If, as RSC contends, that work was interfered with by the DEQ and Spectrum, enforcement of the Plan is necessarily implicated. Without making any determination with regard to whether the alleged interference or conversion actually occurred, Claim Eight against Spectrum does relate to the enforcement and implementation of the terms of the Plan and will not be dismissed. Claim Ten is discussed below with Claims Nine and Eleven.

## B. Supplemental Jurisdiction Under 28 U.S.C. § 1367 and Claims Nine, Ten and Eleven

### 1. Sec. 1367 generally as applied in bankruptcy cases

RSC claims this court has supplemental jurisdiction over Claims Nine, Ten and Eleven pursuant to 28 U.S.C. § 1367, which states that

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such jurisdiction shall include claims that involve the joinder or intervention of additional parties.

The threshold issue is whether a bankruptcy court has the power to exercise supplemental jurisdiction. RSC provides a detailed description of supplemental jurisdiction, along with its history and purported application to this case, and states that according to *In re Davis*, 177 B.R. 907, 912 (9th Cir. BAP 1995), bankruptcy courts have the power to exercise supplemental jurisdiction. The DEQ argues that bankruptcy courts do not have jurisdictional power under § 1367. In the

alternative, the DEQ asserts that RSC has made no federal claim to which supplemental jurisdiction could apply. Spectrum argues that *Davis* does not stand for the proposition that bankruptcy may exercise supplemental jurisdiction under § 1367.

In *Davis*, the Ninth Circuit Bankruptcy Appellate Panel ("B.A.P.") said that if the "state law claims are sufficiently related to the federal claims, the bankruptcy court had jurisdiction over those claims under the doctrine of supplemental jurisdiction." *Id.* The B.A.P. based its conclusion on § 1367 and found the exercise of supplemental jurisdiction proper. *Id.* The B.A.P. cited one case that found § 1367 applicable to bankruptcy courts, *In re Eads*, 135 B.R. 387, 394 (Bankr.E.D.Cal.1991), and other courts have found likewise. *See, e.g., In re W.J. Servs., Inc.*, 139 B.R. 824, 826 (Bankr. S.D.Tex.1992). *Cf. In re Walker*, 51 F.3d 562, 571–73 (5th Cir.1995) (holding to the contrary and finding bankruptcy courts could not exercise supplemental jurisdiction).

The Ninth Circuit held in *In re Carraher*, 971 F.2d 327 (9th Cir.1992) that rules governing a bankruptcy court's jurisdiction over claims related to a terminated bankruptcy proceeding are guided by the rules governing the authority of a federal district court to retain pendant state claims after federal claims have been dismissed. *Id.* at 328. Importantly, *In re Carraher* was cited by the Ninth Circuit in a recent case, *In re Kieslich*, 258 F.3d 968 (9th Cir.2001), arising from a decision made by this court. In its opinion in *Kieslich*, the Ninth Circuit said there was subject matter jurisdiction, "albeit supplemental jurisdiction, in this case." *Id.* at 970. It went on to note that, although in the case before it the issue was the bankruptcy court's decision to retain jurisdiction over an adversary proceeding related to a terminated

bankruptcy case and not the issue of a district court's decision to retain supplemental jurisdiction, the same rules should apply and cited *In re Carraher*. *Id.* at 971. Thus, both the Ninth Circuit Court of Appeals and the Ninth Circuit B.A.P. have found that bankruptcy courts have supplemental jurisdiction and that the rules applicable to supplemental jurisdiction are applicable in bankruptcy proceedings.

## 2. Sec. 1367 applied in this case

 Because § 1367 jurisdiction may be exercised by this court, the remaining issue is whether that jurisdiction may be properly applied in this case. DEQ's only argument against applying supplemental jurisdiction here is that there is no federal claim to which supplemental jurisdiction may attach. *See In re Davis*, 177 B.R. at 912 (noting that state claims must be sufficiently related to federal claims). The DEQ argues that RSC's first and second claims are state law claims only, not part of the bankruptcy proceedings as RSC alleges, and thus not federal claims that could be used to support supplemental jurisdiction.

Claim One is for breach of the Plan and the Zortman Agreement.[3] The Plan obviously could not exist outside of bankruptcy, so Claim One is federal in nature. Claim Two alleges a breach of the covenant of good faith and fair dealing. Although it does not mention the Plan specifically, it does incorporate earlier allegations pertaining to the Plan, and the alleged covenant must necessarily have been within the Plan or Zortman Agreement. Since Claim Two also discusses the work that was to be done by RSC, because RSC was created for the purposes of the Plan implementation, and

---

**3.** The Zortman Agreement, though not directly incorporated into the Plan, was a key part

of Plan confirmation. *See* Sec. III(A)(1), *supra.*

RSC would not exist outside of the bankruptcy case, Claim Two is also federal in nature. There is a common nucleus of operative facts. Among these alleged facts are Debtors' obligations under the Plan and the Zortman Agreement to create and form RSC to comply with § 1123(a)(5), DEQ's duties and obligations regarding RSC pertaining to reclamation and employment of Zortman Mining Inc.'s employees; distribution to Debtors' creditors, and various enforcement and implementation disputes. *See also* Sec. III(A), *supra*, discussing the "related to" nature of both of these claims.

 Because the only real objection to the application of § 1367 in this case was the federal claim issue raised by the DEQ and addressed above, further discussion need not be extensive. Where a federal claim exists, supplemental jurisdiction may be applied to state law claims that arise out of a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir.1988). In this case, Claims Nine, Ten and Eleven all arise from the same set of circumstances that gave rise to Claims One and Two, namely the creation of RSC and the relationship of PGC, the DEQ and Spectrum with RSC and the work to be performed by RSC employees.

Spectrum attempts to distinguish itself from the DEQ, noting that it was not part of the bankruptcy proceedings, which the DEQ certainly was. *See* Sec. IV(B), *infra*. Spectrum may be correct in this regard,

but supplemental jurisdiction is able to reach pendant parties so long as the claim arises out of that same nucleus of operative fact. This is plain enough from the statute itself which, as noted above, states that "[s]uch jurisdiction shall include claims that involve the joinder or intervention of additional parties." § 1367(a); *see also Yanez v. U.S.*, 989 F.2d 323, 327 n. 3 (9th Cir.1993) (noting that "Congress has now explicitly authorized pendent party jurisdiction ('supplemental jurisdiction') [under] 28 U.S.C. § 1367"). It is true that supplemental jurisdiction is a doctrine of some discretion,[4] but because its purpose is to further "judicial economy, convenience and fairness to litigants," *United Mine Workers of America*, 383 U.S. at 726, 86 S.Ct. 1130, it only makes sense to apply it to both the DEQ and Spectrum in this case. Since the facts and circumstances that give rise to Claims Nine, Ten and Eleven are the same as those surrounding Claims One through Eight, it would be a waste of judicial resources to return Claims Nine, Ten and Eleven to the state court. Therefore, the application of supplemental jurisdiction is proper in this case. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 994 (9th Cir.1991).

## IV. WAIVER OF ELEVENTH AMENDMENT IMMUNITY

### A. Eleventh Amendment Background

 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, com-

---

**4.** There are four main circumstances under which a federal court should decline to exercise supplemental jurisdiction, namely if: (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which the district court has original jurisdiction; or (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). None of these four circumstances are found in this case.

menced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." [5] U.S. CONST. Amend. XI. The broad concept of sovereign immunity [6] "arises out of the sovereign status of each State and the inherent nature of sovereignty not to be amenable to the suit of an individual without its consent." *In re Serv. Merch. Co., Inc.*, 265 B.R. 917, 920 (M.D.Tenn.2001).

■■■ However, "even constitutional rights can be waived if not timely asserted." *Hill v. Blind Indus. and Servs. of Maryland*, 179 F.3d 754, 758 (9th Cir. 1999). A state waives its right to sovereign immunity "if the state consents to the jurisdiction of the particular court." *In re Barrett Ref. Corp.*, 221 B.R. 795, 808 (Bankr.W.D.Okla.1998). Waiver is a voluntary act "made by either invoking federal jurisdiction or by a clear declaration." *McGinty v. New York*, 251 F.3d 84, 92–93 (2nd Cir.2001); *see also In re Serv. Merch. Co., Inc.*, 265 B.R. at 922 (noting that "[a] State waives its immunity and consents to suit in a federal court by specific declaration or act ...."). Waiver of this immunity must unequivocally express the state's intention to consent to federal jurisdiction. *In re Jackson*, 184 F.3d 1046, 1049 (9th Cir.1999). A stringent test is applied to determine whether a state has waived its right to claim sovereign immunity. *In re Mitchell*, 209 F.3d 1111, 1117 (9th Cir. 2000); *see also College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Constructive or "implied" waiver is insufficient to defeat the important right of Eleventh Amendment sovereign immunity. *Id.* at 680, 119 S.Ct. 2219 (finding the concept of constructive waiver "ill conceived"); *see also Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (noting that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights ...."). However, a state may certainly waive its right "through its affirmative conduct in litigation." *Arecibo Community Health Care, Inc. v. Commonwealth of Puerto Rico*, 270 F.3d 17, 25 (1st Cir.2001). This type of intentional, active conduct differs from the type of indirect acts the Supreme Court discounted in rejecting the implied waiver theory. For example, "calling upon a federal court's jurisdiction is fundamentally different, for purposes of the Eleventh Amendment, from merely conducting commercial activity." *Id.* at 26.

■■■ Waiver is "triggered by some affirmative activity of a state," *In re 995 Fifth Ave. Assoc.*, 963 F.2d 503, 507 (2d Cir.1992), and the most common way in a bankruptcy case to waive immunity is by filing a claim. *See Gardner v. New Jersey*, 329 U.S. 565, 573–74, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *In re Jackson*, 184 F.3d 1046, 1049 (9th Cir.1999); *In re Straight*, 143 F.3d 1387, 1389–90 (10th Cir.1998); *DeKalb County v. Platter*, 140 F.3d 676 (7th Cir.1998); *In re Barrett Ref. Corp.*, 221 B.R. at 809; *In re Stanley*, 273 B.R. 907 (Bankr.N.D.Fla.2002). *Cf. In re Nel-*

---

5. For an extensive history of the Eleventh Amendment, *see In re Barrett Ref. Corp.*, 221 B.R. 795, 799–801 (Bankr.W.D.Okla.1998). *See also In re Hood*, 262 B.R. 412 (6th Cir. BAP 2001) (analyzing the history of the Eleventh Amendment as it relates to bankruptcy proceedings).

6. The U.S. Supreme Court has noted that, in accordance with its historical, structural view of state sovereign immunity, the phrase "Eleventh Amendment immunity" "is convenient shorthand but something of a misnomer." *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2246, 144 L.Ed.2d 636 (1999). Like the Supreme Court in *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) and like the Ninth Circuit in *In re Lazar*, this court will use that "convenient shorthand."

son, 258 B.R. 374, 376 (W.D.Wis.2001) (finding no waiver against individual where claim was filed against corporation because individual was not personally liable for corporation's debts). Clearly, "it is long-established that a state's participation in a bankruptcy proceeding can trigger a waiver of immunity." *In re 995 Fifth Ave. Assoc.*, 963 F.2d at 507.

■■■■ The Bankruptcy Code also addresses waiver of sovereign immunity at 11 U.S.C. § 106(b), which states in part that "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." "The plain meaning of these words obviously reflects Congress's intent to provide a *waiver* of immunity where a 'governmental unit' files a claim in the bankruptcy court." [7] *In re 995 Fifth Ave. Assoc.*, 963 F.2d at 507 (emphasis in original); *see also In re Gordon Sel–Way, Inc.*, 270 F.3d 280, 285–87 (6th Cir.2001) (finding that government waived its sovereign immunity by filing claim and participating in bankruptcy case). Section 106(b) is a codification of the United States Supreme Court's holding in *Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), which held that a state waives its sovereign immunity when it files a proof of claim in a bankruptcy proceeding. In *Gardner*, the Supreme Court stated:

> It is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure ....
> When the State becomes the actor and files a claim against the fund it waives any immunity which it otherwise might have had respecting the adjudication of the claim.

*Id.* at 574, 67 S.Ct. 467. "[I]t is well established that he who invokes the jurisdiction of the bankruptcy court must abide by the consequences of that action." *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 251 F.3d 1372, 1376 (11th Cir. 2001); *see also In re Town & Country Home Nursing Serv., Inc.*, 963 F.2d 1146, 1152 (9th Cir.1991) (analyzing the legislative history of § 106(b) and noting "Congress' desire to prohibit the government from participating in the distribution of the bankruptcy estate without relinquishing part of its sovereign immunity"). Section 106(b) essentially draws "the equitable line across which a state has the option to cross." *In re Straight*, 143 F.3d at 1392.

■■■ The Ninth Circuit has opined on several occasions regarding waiver of sovereign immunity. Initially, in *In re Mitchell*, 209 F.3d 1111 (9th Cir.2000), the court held that Congress' attempt to abrogate sovereign immunity pursuant to 11 U.S.C. § 106(a) was an unconstitutional assertion of Congress' power to the extent § 106(a) authorized filing an adversary complaint against non-consenting states. *Id.* at 1120. The Ninth Circuit based its reasoning upon *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and cases interpreting and applying *Seminole Tribe*. The court in *In re Mitchell* discussed waiver of Eleventh Amendment immunity and noted that the state of California had not waived its immunity under § 106(b) because it had not

---

7. Importantly, unlike § 106(a), § 106(b) does not unconstitutionally *abrogate* a state's immunity, but is a narrow waiver that "merely codifies an existing equitable circumstance under which a state can choose to preserve its immunity by not participating in a bankruptcy proceeding or to partially waive that immunity by filing a claim. The choice is left to the state." *In re Straight*, 143 F.3d 1387, 1392 (10th Cir.1998).

918

filed a proof of claim in the bankruptcy case.

In *In re White*, 139 F.3d 1268 (9th Cir.1998), a credit agency that was an administrative arm of a tribal sovereign actively participated in a bankruptcy reorganization, thereby waiving its sovereign immunity. While dealing with a tribe's sovereign immunity rather than a state's Eleventh Amendment sovereign immunity, the Ninth Circuit quoted at length with approval from *Gardner* and found that because the tribal agency "acknowledged that it had a claim, objected to confirmation of White's plan of reorganization because it thought it was entitled to more than the plan would have allowed, and it sought relief from the bankruptcy court in the form of an order denying confirmation" it had waived its immunity. *Id.* at 1271. The court found that the agency, like New Jersey in the *Gardner* case, had waived its immunity and had done so in both the Chapter 11 case and the converted Chapter 7 case. *Id.* at 1271–73. DEQ's participation appears to have been more pervasive than the tribal agency's participation and the same result is found here. Montana and the DEQ waived any Eleventh Amendment sovereign immunity that may have existed.

In *Hill*, 179 F.3d at 759, the Ninth Circuit relied upon *Gardner* (and other authority) to find that Maryland had waived its Eleventh Amendment sovereign immunity by unequivocally consenting to the jurisdiction of a federal court, actively litigating the case on the merits and waiting until the opening day of trial to assert immunity. *Id.* at 763. Likewise, the DEQ actively litigated within the context of the bankruptcy cases and only when the adversary proceeding was commenced to enforce and implement the Plan, in accordance with the jurisdiction retained pursuant to the Plan and by exercise of supplemental jurisdiction over the other claims, did the DEQ raise the immunity claim. As noted in *Hill*, the Ninth Circuit has reasoned that it can see no valid reason why a party belatedly should be permitted to assert Eleventh Amendment immunity and held that timely assertion of immunity "minimizes the opportunity for improper manipulation of the judicial process." *Id.* at 757–58.

Following *Hill* by six weeks was *In re Jackson*, 184 F.3d 1046 (9th Cir.1999), which concluded waiver of Eleventh Amendment sovereign immunity occurred in a bankruptcy case when the California Franchise Tax Board filed a proof of claim in the bankruptcy case. The Ninth Circuit found § 106(b) codified the holding of *Gardner*, 184 F.3d at 1049, and noted that while the Fourth Circuit found § 106(b) was not constitutional, a state nevertheless waives its sovereign immunity if it files a proof of claim in a bankruptcy case, *In re Creative Goldsmiths*, 119 F.3d 1140, 1148 (4th Cir.1997), *cert denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). The court cited contrary authority that found § 106(b) to be unaffected by the *Seminole Tribe* decision (*In re Straight, supra*); however, it declined "to address the issue of whether § 106(b) is constitutional because the Board's conduct falls squarely under the Supreme Court's decision in *Gardner v. New Jersey*." *Id.* at 1050. The court also commented that in both *In re Burke*, 146 F.3d 1313, 1317–20 (11th Cir.1998), and *In re Platter*, 140 F.3d 676, 678–80 (7th Cir.1998), those circuits declined to address the constitutionality of § 106(b) and instead relied upon *Gardner* to conclude that a state waives its sovereign immunity when it files a proof of claim in a bankruptcy proceeding. The Ninth Circuit held it would "follow the lead" of those circuits to likewise conclude California waived its sovereign immunity when it filed a proof of claim. *In re Jackson*, 184 F.3d at 1050. Similarly, this

court follows the lead of the Ninth Circuit and finds Montana and the DEQ waived its sovereign immunity when it filed a proof of claim and actively participated in the bankruptcy cases.

*In re Lazar* appears to be the Ninth Circuit's most current decision regarding waiver of sovereign immunity in bankruptcy proceedings and, as noted, the U.S. Supreme Court recently declined to consider the matter. The circuit found that "when a state or an 'arm of the state' files a proof of claim in a bankruptcy proceeding, the state waives its Eleventh Amendment immunity with regard to the bankruptcy estate's claims that arise from the same transaction or occurrence as the state's claim." 237 F.3d at 978. The court also discussed the split among the courts regarding the constitutionality of § 106(a) and (b), but because it found the filing of proofs of claim in the bankruptcy case logically related to the bankruptcy trustee's claim in an adversary proceeding constituted a waiver of any Eleventh Amendment immunity, it did not reach the issue of the constitutionality of § 106(b). *Id.* at 981.

The foregoing analysis establishes that the waiver of Eleventh Amendment sovereign immunity can occur as a result of a state or an arm of the state filing a proof of claim in a bankruptcy case and when a state, as a creditor, becomes an active, significant participant in the bankruptcy case.

**B. Montana and DEQ's Conduct in the Bankruptcy Cases Was a Waiver of Any Eleventh Amendment Sovereign Immunity**

▬▬▬▬ Consistent with the cases cited above, Montana and the DEQ actively and aggressively participated in these bankruptcy cases. Consequently, the "waiver by participation doctrine" referred to in *In re 995 Fifth Ave. Assoc.* applies here. 963 F.2d at 508. The DEQ has actively participated in this case,[8] well beyond the mere filing of claims, and that active, constant participation is incompatible with an intent to preserve its Eleventh Amendment immunity. Initially, "[t]he filing of a proof of claim . . . is an affirmative claim for relief." *In re Barrett Ref. Corp.*, 221 B.R. at 811. In this case, the DEQ sought—and was ultimately provided under the Plan—more than $1 million. In addition to filing four proofs of claim against the Debtors, the DEQ participated in many hearings, contested various matters, and filed numerous motions and pleadings with this Court. *See, e.g., In re Bliemeister*, 251 B.R. 383, 393 (Bankr.D.Ariz.2000)[9] (finding waiver where the State "did not merely answer the complaint but affirmatively sought summary judgment"); *In re White*, 139 F.3d at 1271 (finding waiver where tribal agency filed its claim, objected to plan confirmation, and sought an order denying confirmation).

DEQ's waiver is made clearly evident by its actions and pervasive involvement throughout the bankruptcy proceeding as illustrated by the exhibits attached to the Declaration of David Hillman dated June 30, 2000. The filing of proofs of claim and other participation far exceed a mere general appearance. For example, in its capacity as an unsecured creditor, the DEQ filed: (1) an application for an administrative expense under 11 U.S.C. § 503(b); (2) an application for relief from the automatic stay under 11 U.S.C. § 362(d); (3) an application for adequate protection under 11 U.S.C. § 361; and (4) a motion to extend

---

8. There is no dispute that the DEQ is arm of the state of Montana.

9. *Bliemeister* was affirmed, solely on the basis of waiver, by the United States District Court for the District of Arizona on March 28, 2001 (Case No. CIV 00–1557–PHX–SRB, No. 27).

the proof of claim bar date under 11 U.S.C. § 502. The DEQ also objected to: (1) the Debtors' Disclosure Statement under 11 U.S.C. § 1125(a)(1) and § 1122; (2) the Bank Settlement Agreement and the InterCompany Settlement Agreement; and (3) Plan confirmation. Furthermore, the DEQ participated in (1) every Plan confirmation hearing; (2) negotiations that led to the creation of RSC; and (3) negotiations that ultimately led to the Zortman Agreement. This undisputed and extensive participation can lead to no other result other than that the DEQ was submitting itself to this court's jurisdiction. *See In re Mann,* 907 F.2d 923, 926 (9th Cir. 1990) (finding that debtor, through his conduct, consented to the bankruptcy court's jurisdiction). At the outset of this case, the DEQ had a choice to make: It could "eschew bankruptcy relief and retain its immunity" or it could "doff the protective cloak and join the ranks of creditors seeking the benefits of the debtor's estate." *In re Straight,* 143 F.3d at 1392. There is not the slightest doubt that the DEQ chose to do the latter.

The DEQ may not be permitted to have the best of both worlds. *See Hill,* 179 F.3d at 756. It may not first assert its claims, actively seek to maximize its recovery, and then later turn around and use the Eleventh Amendment as a shield. The DEQ may not claim to preserve its rights, as it broadly attempted to do in its proofs of claim,[10] and then repeatedly act in a manner wholly inconsistent with any such intent. The DEQ knew at the beginning of the bankruptcy whether or not it was an "arm of the state" and thus possibly entitled to the protections of the Eleventh Amendment. Any immunity assertion

could have and should have been made at that time and subsequent conduct should have been consistent with any such assertion. Notably, it was not. A state either participates in the case as a creditor rather than a sovereign by filing a proof or proofs of claim and thereby waives its Eleventh Amendment sovereign immunity or it does not participate. It is the state's choice. *In re Straight,* 143 F.3d at 1392. The state of Mississippi's attempt to "reserve" its ability to assert sovereign immunity despite having filed a proof of claim was rejected in *In re Barrett Ref. Corp.,* 221 B.R. at 812. In the same case, Mississippi wanted to withdraw its proof of claim to preserve its claimed Eleventh Amendment sovereign immunity but, relying upon "extensive support throughout American jurisprudence," (citations omitted), the court held that "once a waiver of rights has been made it cannot be undone." *Id.* at 814. Likewise, the state of Florida was deemed to have waived its sovereign immunity even though it withdrew its proofs of claim in *In re Stanley,* 273 B.R. 907.

The DEQ chose, as it was certainly entitled to do, to become a central participant in these bankruptcy cases and assert its claims. "That choice is not constitutionally profound, and it is in accord with one of the fundamental principles of bankruptcy" that requires all participants to submit to the same requirements. *In re Straight,* 143 F.3d at 1392. This principle reinforces the fact that if a state agency elects to become part of a federal case, "it should be held to that choice the same as any other litigant." *Hill,* 179 F.3d at 758. The DEQ may be able to have it one way or the other, but not both. By its express conduct of active and pervasive participation

---

**10.** A section in each proof of claim the DEQ filed stated that "nothing in this Proof of Claim constitutes a waiver of any rights." Hillman Decl. Ex. A, Tabs 18–21. This language is legally irrelevant and is analogous to an impermissible attempt to "reserve" immunity or to withdraw proofs of claim. *See In re Stanley,* 273 B.R. 907 (Bankr.N.D.Fla.2002); *In re Barrett Ref. Corp.,* 221 B.R. at 812, 814.

in the bankruptcy case, the DEQ waived any claim of Eleventh Amendment immunity it could have made earlier.

DEQ's argument that there can be no unequivocal waiver based on a "general appearance" may be correct, but for purposes of this case it is largely irrelevant. *In re Lazar*, 237 F.3d 967, 981 n. 14 (9th Cir.2001), *cert denied*, —— U.S. ——, 122 S.Ct. 458, 151 L.Ed.2d 377 (2001). While *Lazar* found no waiver based on a general appearance as noted in footnote 14, in the actual holding of the case the court *found* waiver based on the filing of proofs of claim. *See Lazar*, 237 F.3d at 981 (holding that "because the BOE filed proofs of claim in the bankruptcy proceeding that arise out of the same transaction or occurrence ..., the State Board has waived its Eleventh Amendment immunity in the Mandamus Adversary"). In addition, as a separate basis for finding waiver, in this case the DEQ did far more than make a simple general appearance but instead participated heavily throughout the proceedings. *See* Sec. IV(B), *infra*.

In *Lazar*, the Ninth Circuit, after holding that by filing a proof of claim a state waives its Eleventh Amendment immunity with regard to the bankruptcy estate's claims that arise from the same transaction or occurrence as the state's claim, it applied the "logical relationship" test of Fed.R.Civ.P. 13(a). *Id.* at 978; *see also In re Pinkstaff*, 974 F.2d 113, 115 (9th Cir. 1992) (following the "logical relationship" test). The Sixth Circuit in *In re Gordon Sel–Way, Inc.*, 270 F.3d at 286–87, also applied the "logical relationship" test. It said that the § 106(b) "transaction or occurrence" language should be interpreted liberally and a transaction may consist of a series of occurrences depending upon their logical relationship even if not arising at the same time. *See also Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1252 (9th Cir.1987).

In this case, there is a logical relationship between DEQ's claims and the instant action. The DEQ participated in lengthy negotiations with Debtors regarding its claims, and ultimately arrived at the Zortman Agreement, the creation of RSC and the consensual Plan provisions referred to herein. The Zortman Agreement was closely related to the Plan and, as analyzed above, the DEQ may not now remove itself from the forum to which it submitted itself all along.[11] In *Lazar*, the Ninth Circuit did not limit the waiver of immunity to compulsory counterclaims. It cited various authority for the proposition that the term "transaction" is receiving an "increasingly liberal construction" and that the pertinent inquiry is whether the claim *arises out of* the same transaction and not whether they are *from* the same transaction. 237 F.3d at 979–80. The claims for relief in the Amended Complaint arise out of the same transaction and occurrences referred to in the DEQ's proofs of claim. They all involve the resolution and implementation of the reclamation for the Zortman mine sites and water treatment issues in accord with the Zortman Agreement and the Plan by utilizing the mechanism of RSC consistent with 11 U.S.C. § 1123(a)(5).

Because DEQ expressly waived any Eleventh Amendment immunity it may have had by filing proofs of claim and by its pervasive participation in the bankruptcy case, this court will follow "the prudential rule of avoiding constitutional questions ...." *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 7, 113 S.Ct. 2462,

---

11. Though the DEQ argues such waiver is limited only to compulsory counterclaims under Fed.R.Civ.P. 13(a), this has never been held to be so in the Ninth Circuit. It is simply unquestioned that sovereign immunity is waived in that circumstance, not limited thereto. *Cf. In re Friendship Med. Ctr., Ltd.*, 710 F.2d 1297, 1301 (7th Cir.1983).

125 L.Ed.2d 1 (1993); *see also Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391–92 (9th Cir.1994) (noting that "[i]t is well-established that we should avoid adjudication of federal constitutional claims when alternative ... grounds are available"); *In re Rose*, 187 F.3d 926, 930 (8th Cir.1999) (finding waiver of Eleventh Amendment immunity and thus declining to address constitutional issues); *In re Stanley*, 273 B.R. 907 (finding it unnecessary to address constitutional issue due to waiver). Consequently, arguments regarding whether sovereign immunity is applicable to bankruptcy cases[12] will not be addressed because of DEQ's waiver of Eleventh Amendment sovereign immunity even if applicable.

## V. FED. R. BANKR. P. 7009(b)

Finally, it is contended by Defendants that the Amended Complaint does not satisfy the requirements of Fed. R. Bankr.P. 7009(b). This contention is found to be without merit. The Amended Complaint adequately pleads facts with particularity sufficient to enable Defendants to prepare an answer. *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir.1973).

## VI. CONCLUSION

IT IS HEREBY ORDERED that Motions to Dismiss filed by Defendants, and each of them, are DENIED.

**12.** Though there is a split on the issue, some courts have found that Eleventh Amendment sovereign immunity either is not or may not be abrogated by the Bankruptcy Code or is not available to states in bankruptcy proceedings. *See Seminole Tribe*, 517 U.S. at 74 n. 16, 116 S.Ct. 1114; *In re Hood*, 262 B.R. 412; *see also In re Arnold*, 255 B.R. 845 (Bankr. W.D.Tenn.2000); *In re Lees*, 252 B.R. 441 (Bankr.W.D.Tenn.2000); *In re Bliemeister*, 251 B.R. at 393; *In re Willis*, 230 B.R. 619 (Bankr.E.D.Okla.1999); *In re Barrett Ref. Corp.*, 221 B.R. at 804–08. *Cf. In re Murphy*, 271 F.3d 629, 631–32 (5th Cir.2001); *In re Mitchell*, 209 F.3d 1111 (9th Cir.2000); *In re Sacred Heart Hospital*, 133 F.3d 237 (3rd Cir. 1998); *In re Claxton*, 273 B.R. 174, 182–83 (Bankr.N.D.Ill.2002); *In re Serv. Merch. Co., Inc.*, 265 B.R. at 922; *In re Scarborough*, 229 B.R. 145 (Bankr.W.D.Mich.1999); *In re Pitts*, 241 B.R. 862 (Bankr.N.D.Ohio 1999).